**Leroy HARRIS, Appellant,**

v.

**Walter M. RIDDLE, Superintendent of the Virginia State Penitentiary, Appellee.**

**No. 76–1540.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1976.

Decided March 14, 1977.

Mark Merson, Washington, D.C., for appellant.

Jim L. Chin, Asst. Atty. Gen. of Virginia, Richmond, Va. (Andrew P. Miller, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellee.

Before CRAVEN and RUSSELL, Circuit Judges, and MERHIGE, District Judge.*

CRAVEN, Circuit Judge:

This is an appeal by state prisoner Leroy Harris, imprisoned for felony murder, from the denial of habeas relief in the district court. The only question presented is whether Harris knowingly and intelligently waived his Fifth Amendment privilege against self-incrimination and his right to counsel when he orally admitted his participation in the offense. For reasons to be stated, we hold that Harris' waiver was knowing and intelligent, and affirm the decision below.

* Sitting by designation.

## I.

Three days after the commission of a homicide in the course of a robbery, the police of Newport News, Virginia, arrested Harris and took him to the police station at about 9:15 p. m. Captain Weaver of the Detective Bureau told Harris that he was charged with armed robbery and murder and correctly read him his *Miranda* rights. Harris said he understood them. Some 20 minutes later Lt. Austin repeated the *Miranda* warnings and again advised Harris of the charges against him, requesting that Harris sign a waiver-of-rights form. Harris refused to sign, but expressed his willingness to talk and reaffirmed that he understood the explanation to him of his *Miranda* rights.

Lt. Austin knew Harris' parents and telephoned the boy's mother and requested she come to the station right away. Lt. Austin also permitted Harris to telephone his girlfriend and later his sister. While all this was going on, Harris talked freely, insisting that, although present at the place of robbery and homicide, and although carrying a pistol, he did not fire it.

About an hour after beginning their conversation, Harris and Lt. Austin were joined by Harris' uncle, who had come in response to the telephone call to Harris' mother. In the uncle's presence, Harris was advised of his *Miranda* rights for the third time. He told his uncle he had not been mistreated in any way. Harris and his uncle were offered the opportunity to talk privately but declined. Harris was then asked by Lt. Austin to relate the facts of the robbery to his uncle, and Harris substantially repeated his earlier oral statement. It was this statement before his uncle that was later admitted into evidence against him.

During the course of making his confession, according to Lt. Austin's testimony, Harris explained to Austin that he was willing to talk about it but would not sign anything. The Lieutenant's testimony is susceptible to three interpretations, and for decisional purposes we read it (favorably to Harris) to mean that Harris talked freely but would not sign anything because (1) Harris thought that if he simply told about it, it would be Lt. Austin's word against his and, if he later decided to deny the conversation, the judge would believe him rather than Austin; (2) Harris thought an oral confession inadmissible in court; and (3) Harris misunderstood the elements of felony murder and thought that proof that he personally fired the gun was essential to convicting him of the graver offense.

Harris was 17 years old. His I.Q. was 67, which is within the "dull-normal" range of intelligence at about the sixth-grade level. His poorly developed language skills were at about the third-grade level. At trial the defense psychiatrist conceded, however, that Harris understood both his right to remain silent and that anything he said could and would be used against him, though, as to the latter, he might not understand "to what degree and to what extent it would be used or what charges [it would support]." The psychiatrist further testified that Harris' limited understanding of the consequences of talking would be shared by "many people even with a superior I.Q.," and that the primary source of Harris' confusion was his ignorance of the felony-murder doctrine.

Harris' confession was admitted over objection that it was not the product of a knowing and intelligent waiver of his right to keep silent within the meaning of *Miranda.* Although no direct appeal was filed, a petition for habeas corpus to the Virginia Supreme Court was denied on the merits.

## II.

Pursuant to *Miranda v. Arizona,* 384 U.S. 436, 468 et seq., 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Harris was told (1) that he had the right to remain silent; (2) that anything he said could be and would be used against him in court; (3) that he had the right to have counsel present at the interrogation, and that if he could not afford counsel a lawyer would be provided him; and (4) that if at any time during questioning he decided to remain silent, further interrogation would cease.

But Harris contends, and we agree, that his statement to Lt. Austin revealed that he was ignorant of the law and misinformed and erroneously thought he was exculpating himself rather than incriminating himself. Thus the question presented is whether *Miranda* puts upon the police the obligation to go beyond the prescribed warnings to make sure that the person being questioned understands not only his right to remain silent but also the consequences of his failure to exercise it. Harris relies heavily upon the following quotation from *Miranda*:

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant *knowingly and intelligently waived his privilege against self-incrimination* and his right to retained or appointed counsel.

384 U.S. at 475, 86 S.Ct. at 1628 (emphasis added).

He contends that his ignorance of the substantive criminal law and the rules of evidence made his waiver *un*intelligent, calling our attention to *Frazier v. United States,* 136 U.S.App.D.C. 180, 419 F.2d 1161 (1969) (Bazelon, C. J.). In that case a panel of the court held that where the suspect continued talking but instructed officers not to take notes, his so doing was a sufficient indication of possible misunderstanding to require that the interrogation be stopped and the matter clarified. But that panel decision was reversed by the en banc court:

> It was not for [the sergeant] to place a legal interpretation on the language of *Miranda* warnings he was directed to give, and to continue or to suspend the interrogation in accordance with what that interpretation might be. He had given the warning as required; appellant has signified his understanding and his wish to talk without a lawyer present.

*Frazier v. United States,* 155 U.S.App.D.C. 135, 143, 476 F.2d 891, 899 (1973). We agree. The suspect's ban on note-taking was fully consistent with an understanding of his rights, since as the government there argued, he "may have reasoned that if he decided to recant, he would deny he said anything, and it would be his word against that of the police." 476 F.2d at 905. So it is with part of Harris' claim in our case: he thought the judge would believe him rather than Austin.

But as we have noted, that is not the only reason assigned by Harris for talking but refusing to sign anything. He erroneously believed that an oral confession would not be harmful to him and could not be used against him. Thus the question becomes: where a suspect has been correctly warned, using the prescribed *Miranda* language, and the suspect thereafter indicates a misapprehension of law, does the State have a duty to correct the misapprehension?

We think not. If the question were answered "yes," how would the duty be implemented? What would suffice? A statement of the majority rule with or without a caveat? Harris had already been told that if he made a statement it could and would be used against him. That warning had been repeated three times. A fourth warning, even though phrased differently, might not suffice. Yet it does seem likely that if Lt. Austin had said to Harris, "Look, you are making a mistake; what you tell me *will* be used against you even though I do not write it down and you do not sign it, and you do not have to shoot the gun to be guilty," such a warning would have been grasped and understood and perhaps heeded.

But *Miranda* does not put upon the police the burden of explaining the rules of evidence and the substantive criminal law. The average interrogating police officer is not capable of it. It surely would have been helpful to Harris to have had a lawyer present to explain to him the felony-murder doctrine and the admissibility of an oral confession. But police officers cannot act as counsel even if the burden were properly theirs, and it is not. When the police have fully and fairly given a suspect the *Miranda* warnings their duty is discharged, and we hold that they are under no further and

additional duty whether or not the suspect acts wisely or foolishly or misapprehends either the facts or the law.

■ It is true, as Harris insists, that his waiver of his right to silence turned out to be unwise and in that sense unintelligent because he misunderstood the evidentiary value of what he said. In *United States v. Hall,* 396 F.2d 841 (4th Cir. 1968), however, this court rejected the analogous claim that ignorance of a high degree of punishment allowable for the crime charged (robbery) prevented a "knowing and intelligent waiver." There we said:

> [T]he test is not whether Hall made an intelligent decision in the sense that it was wise or smart to admit his participation in the crime, but whether his decision was made with *the full understanding that he need say nothing and that he might then consult with a lawyer if he so desired.*

396 F.2d at 846 (emphasis added).

The undisputed facts and psychological evidence indicate that Harris chose to speak with the knowledge that he could keep silent or have counsel present while he talked. That is the meaning of intelligent waiver; that and no more. It is wholly irrelevant that the decision to talk turns out to be wise or foolish, or that the decision is the result of poor cerebration or misinformation as to the law and/or the facts.

> [I]f a defendant was given the Miranda warnings, if the coercion of custodial interrogation was thus dissipated, his "waiver" was no less "voluntary" and "knowing" and "intelligent" because he misconceived the inculpatory thrust of the facts he admitted, or because he thought that what he said could not be used because it was only oral or because he had his fingers crossed, or because he could well have used a lawyer. A man need not have the understanding of a lawyer to waive one. . . . *With such warnings, the essential fact remains that the defendant understood he had the right to remain silent and thereby to avoid the risk of self-incrimination. That*

*is what the Fifth Amendment privilege is about.*

*State v. McKnight,* 52 N.J. 35, 54–55, 243 A.2d 240, 251 (1968) (Weintraub, C. J.) (emphasis added).

*AFFIRMED.*