PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee,*

　　　　v.

DAVID THOMAS CLENNEY,

　　　　　*Defendant-Appellant.*

No. 09-5114

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:09-cr-00135-TSE-1)

Argued: December 10, 2010

Decided: February 3, 2011

Before WILKINSON, SHEDD, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Shedd and Judge Duncan joined.

## COUNSEL

**ARGUED:** Marvin David Miller, Alexandria, Virginia, for
Appellant. Lisa Owings, OFFICE OF THE UNITED
STATES ATTORNEY, Alexandria, Virginia, for Appellee.
**ON BRIEF:** Heather Golias, LAW OFFICES OF MARVIN

D. MILLER, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

David Clenney appeals his conviction for possessing a firearm in violation of 18 U.S.C. § 922(g)(1). Finding no merit in his various contentions, we affirm the judgment of the district court.

I.

On March 12, 2009, David Clenney was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The charge resulted from a firearm found in Clenney's residence on January 30, 2009. Clenney filed a motion to suppress the firearm. At the outset of the suppression hearing, the district court noted that Clenney was seeking to adduce evidence that would show that the arrest and search warrant applications included false statements or material omissions that would defeat probable cause. Initially, the district court told Clenney that he could not present such evidence because he had not met the burden that would entitle him to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). But the district court reversed course later in the day and allowed Clenney to present the evidence, granting him a *Franks* hearing "as a matter of grace and out of an abundance of caution."

A.

The evidence presented at the hearing revealed the following facts. On the morning of January 30, 2009, one Jaclyn

Doherty told Detective Michael Fernald of the Prince William County Police Department that an unknown man called her and claimed that he had her 2007 tax records. The caller told Doherty that "he wanted to help everyone out by making some money for himself" and also by getting drug money for Gary Booher, the son of Doherty's tax preparer, Patricia Booher, and the man from whom the caller claimed to have obtained the records. The caller explained that Gary Booher's brother, Blair Booher, had frequently stolen tax records of his mother's clients and then used the records to procure drug money. And now Gary Booher was following in his brother's footsteps.

The caller also warned Doherty that he used to be an FBI informant and knew that the police could not help her. The caller refused to give Doherty his name, refused to meet with her, and refused to provide her with her original tax returns, offering instead only a copy. When Doherty asked the caller to prove that he had her tax records, he did so by reading her personal identifying information. But when the caller read the line from her tax form stating that Doherty was employed by Prince William County, he became noticeably nervous and abruptly hung up the phone.

Doherty also explained that earlier that same day, her mother, Carolyn Hawkins, had received a call from an unknown person who told her that he obtained her tax records from her tax preparer, Patricia Booher, and that he was interested in returning them to her. The caller did not ask for money. Doherty stated that Hawkins "felt very comfortable when she got off the phone with him, but she was a little uneasy at why he called in the first place."

At this point, Detective Fernald asked Doherty to make a recorded phone call to the number from which the caller had called, which was listed on Doherty's phone. During this recorded call, the caller refused Doherty's offer of money in exchange for the records. But Doherty recognized a marked

change in the caller's demeanor, from threatening in the first call to conciliatory in the second.

Fernald continued his investigation and called the phone number again, reaching the voicemail for a company called AMC Design 6. Doherty indicated that the voice on the voicemail matched the voice of the man who had called her. Fernald confirmed through phone records that this phone number was the source of outgoing calls to Hawkins and Doherty. He connected AMC Design 6 with an address on Wembley Central Terrace in Loudoun County, Virginia, and he learned that Clenney lived at that address.

After these steps in the investigation, Fernald obtained an arrest warrant charging Clenney with attempted extortion. Along with other officers, he arrested Clenney at his home at approximately 6:00 p.m. Fernald read Clenney his *Miranda* rights, which he waived, and Clenney suggested that they talk in the living room. When Fernald entered the living room, he noticed a Boost Mobile phone, which, according to the phone records, was the make of the phone belonging to the phone number from which the call to Doherty had originated. Fernald then interviewed Clenney. Clenney admitted that he had called Doherty and Hawkins that morning, and he further explained that he had Doherty's tax records in his basement.

After Clenney withheld consent to search the home, Fernald left to obtain a search warrant. Several officers remained behind with Clenney. The search warrant application was supported by Fernald's affidavit, which included many of the facts he had learned during the course of his investigation. At approximately 8:05 p.m., the magistrate issued the warrant, and Fernald notified the officers who had remained at the home that they could begin the search. During the search, the officers found a Crown Royal bag in the back of the closet. An officer opened the bag and discovered a firearm, which was seized because the officers knew Clenney was legally prohibited from having a firearm.

At approximately 8:45 p.m., while the search was ongoing, Fernald returned to the home. He turned on the Boost Mobile phone he had seen earlier and, using his own phone, called the number from which the call to Doherty had originated. The Boost Mobile phone began to ring, confirming his suspicion that the Doherty call had been made from that phone. Fernald also asked Clenney about the firearm the other officers had found, and Clenney admitted that it was his. The officers then brought Clenney before a magistrate in Prince William County at approximately 11:30 p.m.

## B.

Following the suppression hearing, the district court denied Clenney's motion to suppress. Clenney later entered a conditional guilty plea to the indictment. The plea agreement permitted him to appeal the court's adverse determinations concerning the motion to suppress. Clenney now appeals these rulings.

## II.

Clenney argues that the arrest and search warrants were invalid under *Franks* because the warrant applications contained false statements and material omissions. But Clenney is wrong on both counts. Detective Fernald made no false statements in the warrant applications. And the facts Fernald omitted were not material; their inclusion would not have defeated probable cause.

## A.

In *Franks*, the Supreme Court delineated the limited circumstances in which a defendant can attack a facially sufficient warrant affidavit. 438 U.S. at 155-56. The Court set forth a two-step process for defendants seeking to challenge such affidavits. *Id.* First, a defendant must make the rigorous showing necessary to obtain a hearing:

> [W]here the defendant makes a substantial prelimi-
> nary showing that a false statement knowingly and
> intentionally, or with reckless disregard for the truth,
> was included by the affiant in the warrant affidavit,
> and if the allegedly false statement is necessary to
> the finding of probable cause, the Fourth Amend-
> ment requires that a hearing be held at the defen-
> dant's request.

*Id.* This showing "must be more than conclusory" and should
include affidavits or other evidence to overcome the "pre-
sumption of [the warrant's] validity." *Id.* at 171. Second, a
defendant faces additional burdens at the hearing stage:

> In the event that at that hearing the allegation of per-
> jury or reckless disregard is established by the defen-
> dant by a preponderance of the evidence, and, with
> the affidavit's false material set to one side, the affi-
> davit's remaining content is insufficient to establish
> probable cause, the search warrant must be voided
> and the fruits of the search excluded to the same
> extent as if probable cause was lacking on the face
> of the affidavit.

*Id.* at 156.

Clenney claims that Fernald made two false statements in
his warrant applications. First, in both the arrest and search
warrant affidavits Fernald stated that the caller had asked for
money in exchange for the tax records. Second, in the search
warrant application Fernald checked the box indicating that he
had personal knowledge of the facts in the affidavit. While
Clenney is correct that Fernald made these two statements,
neither of them is false.

As for Fernald's statements that the caller sought money,
this was a sound conclusion in light of the facts. In particular,
Fernald relied upon what Doherty told him, and that reliance

was altogether reasonable. During the initial interview, Doherty informed Fernald of the following situation. An unknown man had called her, refused to give his name, and informed her that he had procured her tax records from Gary Booher, the son of her tax preparer. He then explained he wanted to "help everyone out," help that presumably involved obtaining money both for himself and for Booher. The caller told Doherty that Gary Booher's brother had supported his drug habit by profiting off of tax records of his mother's clients, and now Gary was doing the same. The unknown caller then made a none too subtle threat, expressing his desire to make sure Doherty's tax records did not fall into the wrong hands. Before ending the call, the man told Doherty that he was familiar with police procedures from his time as an FBI informant and that the police could not help her. Fernald and Doherty testified to the above sequence of events, and the district court found their testimony to be credible.

Clenney tries to spin these facts by pointing out that the caller never explicitly asked Doherty for payment. This fact, Clenney insists, proves that he was actually a good Samaritan seeking to right a wrong and safeguard Doherty's tax records. But a good Samaritan seeking to return tax records for no remuneration would not make references to wanting money. A good Samaritan would not refuse to give his name and warn Doherty against going to the police. Indeed, if Clenney had sought to return the records, he could have simply returned them to Doherty or left them at some reputable and responsible location instead of making a cryptic and thinly veiled threat. After observing Clenney's demeanor and reviewing his past crimes of dishonesty, the district court reasonably concluded that the caller was seeking money in exchange for the tax records and in effect seeking to sell Doherty's own tax returns back to her. Nothing about Fernald's conduct in securing a warrant even approaches negligence, much less the higher standard *Franks* requires.

Turning to the personal knowledge issue, Clenney is correct that Fernald marked the box indicating that he had per-

sonal knowledge of the facts in the affidavit. But that is not the end of the matter. Fernald had to check one of two boxes, the first indicating that he had personal knowledge of the facts set forth in the affidavit and the second indicating that an informant was the source of the facts and providing space for detailing the credibility of the informant. Fernald checked the first box, but he also wrote "See Affidavit" in the space for informant credibility information. Fernald testified that he filled out the form in this manner because he thought that neither of the two options fit his situation perfectly. Accordingly, he tried to cover all of his bases and give the magistrate all the information. The affidavit makes clear that his knowledge of the content of the first phone call is based on his interview with Doherty. And Clenney presented no evidence of an effort to deceive the magistrate into thinking that Fernald was present for that phone call. Once more, Clenney has failed to meet his burden under *Franks*.

B.

As for Clenney's assertion that Fernald omitted several facts from the warrant affidavits, the *Franks* threshold is even higher for defendants making claims of omissions rather affirmative false statements. *United States v. Tate*, 524 F.3d 449, 454-55 (4th Cir. 2008). Merely identifying factual omissions is insufficient. *Id.* Rather, to obtain a *Franks* hearing, the defendant must show that the omissions were "*designed to mislead*, or . . . made in *reckless disregard of whether they would mislead*" and that the omissions were material, meaning that their "inclusion in the affidavit would defeat probable cause." *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990). To prevail at the hearing, the defendant must then prove these points by a preponderance of the evidence. *Franks*, 438 U.S. at 155-56.

Clenney offers a litany of omissions. On both the arrest and search warrant applications, Fernald made no mention of the call to Hawkins or the second, recorded call to Doherty. He

also did not go into detail regarding how he obtained the address of AMC Design 6 and how he determined that Clenney was the owner of the property. Additionally, on the arrest warrant application, Fernald did not explain how he determined that Clenney was the unknown caller. The fact that these omissions occurred is undisputed. But these omissions were not designed to mislead the magistrate. And none of them were material.

To begin with, warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). If we "desire to encourage use of the warrant process by police officers," *Illinois v. Gates*, 462 U.S. 213, 237 n.10 (1983), the worst course of action would be to pick apart warrant affidavits from the pristine perch of hindsight or to penalize officers for securing what the law requires. Obtaining a warrant is a process overseen by a neutral magistrate. Magistrates make an independent judgment about the sufficiency of the warrant affidavit. They are free to reject warrant applications that provide scant or insufficient evidence. Indeed, an important rationale for the *Franks* ruling was a respect for the warrant process and the capabilities of magistrates. *Franks*, 438 U.S. at 166-67.

Moreover, Fernald had legitimate reasons for his omissions. The phone call to Hawkins involved a different victim, and the evidence of whether the caller was seeking money from Hawkins was inconclusive. Though Hawkins felt "comfortable" about the call, she also indicated that she was "uneasy."

Doherty's second, recorded call was similarly ambiguous. While the caller did refuse monetary payment in that call, there were indications that the caller suspected police involvement. Indeed, in the initial call, the caller abruptly hung up after learning that Doherty worked for the county government. Add to that the caller's professed expertise on law

enforcement procedures, and it becomes clear that the caller's about-face in the second phone call may have been an act to avoid police detection.

Fernald thus discounted the importance of these two calls, all the more so because he believed Doherty's statement that the caller sought money in the first phone call, a belief the district court found to be credible. And while Clenney argues that the other calls can be viewed as potentially exculpatory, the protections of *Brady v. Maryland*, 373 U.S. 83 (1963), do not apply to warrant application proceedings. *Colkley*, 899 F.2d at 302-03. The Supreme Court has shown no inclination to impart the panoply of trial protections into the warrant application process with all the attendant burdens and delays such a step would entail. *See Franks*, 438 U.S. at 166-72.

As for Clenney's complaints about Fernald not fully explaining how he arrived at various factual conclusions— specifically, how he linked the unidentified caller to the name David Clenney and the address on Wembley Central Terrace –- we are not convinced that Fernald exhibited an intent to deceive the magistrate by choosing to omit these facts. The process of preparing a warrant affidavit requires affiants to exercise discretion by selecting certain facts for inclusion and others for omission**.** *Tate*, 524 F.3d at 454-55. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Colkley*, 899 F.2d at 300.

Moreover, even if Fernald's omission of certain facts were somehow improper, the omissions were not material. The inclusion of facts omitted in the warrant affidavits would not defeat probable cause. With the omitted facts included, the magistrate would have been presented with substantially similar affidavits. The strong evidence of an extortion attempt in the first phone call to Doherty would still have been included. There would also be mention of the two additional phone calls, but these calls were ambiguous at best. The statements

regarding the content of the first Doherty phone call would thus remain unrefuted. As the trial court noted, the caller declining to demand money in other phone calls does not mean he did not seek payment in the first Doherty call.

Furthermore, the so-called omitted facts provide an illustration of the need to be careful what one wishes for. The Hawkins call and the second Doherty call in fact serve to confirm Clenney's identity as the caller as well as the highly unusual nature of Clenney's contact with Doherty in the first place. Thus, the added investigative details Clenney seeks would presumably only bolster Fernald's conclusions as stated in the affidavits. Accordingly, the affidavits Clenney proposes would continue to contain a sufficient showing for probable cause to believe that he attempted to extort money from Doherty and that evidence of this extortion could be found at his residence.

## III.

Clenney next argues that Fernald violated the Electronic Communications Privacy Act of 1986 ("ECPA"), Pub. L. No. 99-508, 100 Stat. 1848, and Virginia law when he obtained Clenney's cellular phone records. Specifically, he claims that Fernald failed to secure a subpoena or warrant for the records, as is required by the ECPA and Virginia law.

The exclusion of inculpatory evidence represents a judicially implied remedy for a constitutional violation. It has no innate statutory roots. The usual avenue for suppression—operation of the exclusionary rule occasioned by a Fourth Amendment violation—is not available to Clenney. Fernald did not violate the Fourth Amendment when he obtained the cellular phone records. Phone customers have no constitutionally cognizable privacy interests in basic subscriber information. *See Smith v. Maryland*, 442 U.S. 735, 743-46 (1979); *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010). Accordingly, Fernald's procurement of Clenney's phone

records did not amount to a constitutional violation, and Clenney is left with his statutory argument for suppression.

## A.

The ECPA protects electronic communications against unauthorized intrusions. *United States v. Suarez*, 906 F.2d 977, 980-82 (4th Cir. 1990). Title II of the ECPA focuses on stored communications. *Id.* at 981 n.8. This part of the ECPA draws a distinction between the content of a communication and the records pertaining to a communication service account. 18 U.S.C. § 2703. To obtain an electronic communication customer's records from a service provider, a governmental entity must follow the procedures outlined in § 2703(c). Absent customer consent, § 2703(c)(1) requires the government to obtain a warrant or court order for the records. The government can bypass these procedures and simply subpoena the records if it seeks only basic subscriber information, such as the name and address of the customer and telephone call logs. 18 U.S.C. § 2703(c)(2). Virginia law imposes similar safeguards on customer records, requiring a grand jury subpoena, search warrant, or court order to obtain them without customer consent. Va. Code Ann. § 19.2-70.3.

## B.

The phone records Fernald obtained fall within the scope of both § 2703(c) and § 19.2-70.3. In fact, they contain many of the elements listed in § 2703(c)(2), including the name and address of the customer and basic information regarding incoming and outgoing calls on that phone line. Therefore, ECPA procedures should have been followed. But Clenney has failed to present any evidence suggesting that Fernald did not follow these procedures. Clenney offers as an excuse that the district court prohibited his line of questioning related to this matter, but any such exchange occurred before the district court decided to grant him a *Franks* hearing. Clenney had

ample opportunity at the hearing to raise the issue, but he chose not to do so.

Furthermore, even if Clenney had shown that Fernald violated the ECPA and Virginia law, the exclusionary rule would not be the appropriate remedy for these violations. As noted, "there is no exclusionary rule generally applicable to statutory violations." *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006); *see United States v. Oriakhi*, 57 F.3d 1290, 1295 n.1 (4th Cir. 1995). In the statutory context, suppression is a creature of the statute, and its availability depends on the statutory text: "The availability of the suppression remedy for . . . statutory, as opposed to constitutional, violations . . . turns on the provisions of [the statute] rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." *United States v. Donovan*, 429 U.S. 413, 432 n.22 (1977).

Turning to the statutes at issue, neither provides suppression of the evidence in federal court as a remedy. The ECPA empowers a victim of a § 2703(c) violation to bring a civil action for appropriate relief against violators other than the United States and provides procedures for administrative discipline of federal officials involved. 18 U.S.C. § 2707. There is no mention of a suppression remedy for such a violation, and § 2708 makes clear that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."

Moreover, Congress has shown that it knows how to create a statutory suppression remedy. It did so in 18 U.S.C. § 2515, which provides for suppression of evidence obtained in violation of the statutes governing wiretaps. Yet it chose not to do so in the context of § 2703(c) violations. Therefore, Congress has made clear that it did not intend to suppress evidence gathered as a result of § 2703(c) violations. *See United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003).

The relevant Virginia statutes similarly provide remedies for violations, including a prohibition on the introduction of evidence in Virginia state court obtained in violation of the statutory procedures. Va. Code Ann. § 19.2-65. But Virginia law does not attempt to direct federal courts to exclude evidence obtained in violation of state statutes. And, in any event, Virginia does not have that power: Federal not state law "governs the admissibility of evidence obtained by state officers but ultimately used in a federal prosecution." *United States v. Clyburn*, 24 F.3d 613, 616 (4th Cir. 1994).

## IV.

Clenney next claims that his waiver of his *Miranda* rights was not knowing and intelligent because he was not informed of the charges against him. But this argument fails for two reasons. First, the evidence suggests that Clenney was aware of the crimes the officers were investigating. When Fernald asked him if he understood why the officers were at his house with an arrest warrant, Clenney said that he thought he knew why the officers were there and then explained that all of it was a misunderstanding.

There is a second flaw in Clenney's argument. *Miranda v. Arizona*, 384 U.S. 436 (1966), does not require that the suspect be informed of the charges against him. *Miranda* requires four warnings before law enforcement officers commence a custodial interrogation:

> [A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id*. at 479. "The four warnings *Miranda* requires are invariable . . . ." *Florida v. Powell*, 130 S. Ct. 1195, 1204 (2010).

Accordingly, this court has rejected attempts to add additional warnings to the time-tested *Miranda* formulation. *See Harris v. Riddle*, 551 F.2d 936, 938-39 (4th Cir. 1977).

*Harris* is instructive. It involved a suspect who believed incorrectly that oral confessions were inadmissible and that the elements of felony murder included proof that the defendant had fired the weapon that killed the victim. *Id.* at 937. The police did not correct these mistaken beliefs and allowed the suspect to confess. *Id.* But we held that the police were under no obligation to go beyond the four *Miranda* warnings: "When the police have fully and fairly given a suspect the *Miranda* warnings their duty is discharged, and we hold that they are under no further and additional duty whether or not the suspect acts wisely or foolishly or misapprehends either the facts or the law." *Id.* at 938-39. The defendant's waiver was knowing and intelligent because he understood his *Miranda* rights, even if he failed to recognize his incorrect factual and legal beliefs. *Id.* at 939.

Similarly, we decline Clenney's invitation to add a fifth warning to *Miranda*. There is a value to keeping things simple and certain. The officers complied with *Miranda*, and that ends the matter. Clenney received valid *Miranda* warnings, understood them, and then waived them. And while it is true that the officers did not inform Clenney of the charges against him, *Miranda* does not impose a duty on law enforcement to do so.

## V.

Clenney's final argument is that there was an unreasonable delay between the time of his arrest and his appearance before a magistrate. But the law and facts indicate that the delay was justified. After being arrested, a defendant must be brought before a magistrate without unnecessary delay. Fed. R. Crim. P. 5. Delays of up to six hours are presumptively reasonable. 18 U.S.C. § 3501(c); *Corley v. United States*, 129 S. Ct. 1558,

1571 (2009). Clenney attempts to undermine this federal standard by citing Virginia law, but Virginia does not have the power to impose rules of evidence on federal courts: "[I]n a federal criminal prosecution, federal standards govern the admissibility of evidence." *United States v. Glasco*, 917 F.2d 797, 798 (4th Cir. 1990) (quoting *United States v. Mealy*, 851 F.2d 890, 907 (7th Cir. 1988)).

Clenney appeared before a magistrate approximately five and one-half hours after his arrest, thus falling within the six hour window. And the facts of the situation reinforce the presumption of reasonableness. The officers arrested Clenney, interrogated him at his home, secured a search warrant from a Loudoun County magistrate, and then transported Clenney to a Prince William County magistrate. All of this took time, and, considering all of the facts, the delay was within the bounds of reasonableness.

## VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.