# United States Court of Appeals
## For the First Circuit

No. 18-2098

BRIAN JOHNSON; KELLEY O'NEIL; CHRISTOPHER JOHNSON; MINOR CHILD,

Plaintiffs, Appellants,

v.

DUXBURY, MASSACHUSSETTS; MATTHEW CLANCY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Chief Judge,
Kayatta and Barron, Circuit Judges.

Michael S. Rabieh, with whom Margaret G. Plaza and The Law Office of Michael S. Rabieh were on brief, for appellants.
John J. Davis, with whom Pierce Davis & Perritano LLP was on brief, for appellees.

July 29, 2019

**BARRON**, **Circuit Judge**.  This appeal concerns a suit that a police officer in the Town of Duxbury, Massachusetts (the "Town") filed under 42 U.S.C. § 1983 in the United States District Court for the District of Massachusetts against the Town and the Town's chief of police.  The suit alleged that the defendants had violated the police officer's rights under the Fourth Amendment of the United States Constitution by demanding his cell and home phone records in connection with the Duxbury Police Department's ("DPD") internal investigation of him in 2015.  The District Court granted the defendants' motion for summary judgment.  We affirm.

**I.**

Brian Johnson was employed, at all relevant times, by the Town as a police officer.  In December 2015, Matthew Clancy, the Town's Chief of Police, opened an internal investigation concerning Johnson.  "The purpose of the investigation was to determine whether Officer Johnson . . . violated any DPD policies, procedures, rules or regulations upon [his] receipt of information regarding" an ongoing murder investigation in a nearby town.  That murder investigation concerned the death of Robert McKenna, whose body was found in September 2015, and the five firearms that were stolen from the scene of that crime.

The undisputed record shows that Brianna St. Peter, an acquaintance of Johnson, called Johnson in October 2015 about the arrest of a potential suspect in the McKenna murder, that Johnson

- 2 -

was subpoenaed in November 2015 to testify before a grand jury about the McKenna murder, and that Johnson did not inform Clancy or any of his superiors at the DPD about either event. Clancy opened the internal investigation into Johnson after he "receiv[ed] information" that Johnson "may have had knowledge of the McKenna murder and/or of the stolen firearms, yet failed to disclose such knowledge to the investigating authorities, [his] superior officers or the DPD."

In February 2016, as part of that investigation, Clancy "order[ed]" Johnson -- in a formal letter -- to provide "a copy of [his] Phone Records for the period of time including July 1, 2014 through to February 15, 2016," including "the records for any phone numbers; landline(s) or cell phone(s) and any other cell phone records registered in [his] name and/or used by [him] during that time period." The letter further stated that "[t]he records for cellphones should include a listing (phone numbers) for all incoming and outgoing calls and text messages made by [Johnson] and to [him] from those cell phone[s] registered to [him] for the time period requested" and that "[t]he record(s) should be issued by the cell phone provider . . . in the normal format." The letter informed Johnson that "[f]ailure to conform to this order . . . will be considered a violation[] of the department's

rules and regulations . . . and will result in discipline up to and including termination."[1]

Johnson thereafter retained counsel through the union. That counsel informed Clancy that he had advised Johnson "to respectfully decline to comply with" the order because it was "unreasonably overbroad and vague." In March 2016, Johnson's counsel and the Town's counsel agreed upon a "limited production process for the requested phone records."[2] Through that process, Clancy would "identify certain numbers potentially relevant to the [internal] investigation," and Johnson would produce redacted records that would contain only "information regarding the relevant phone numbers." Clancy then sent a letter to Johnson that detailed "order[s]" for the revised production process, in

---

[1] Johnson had been the subject of an internal investigation in 2013 that concerned an alleged altercation between Johnson and his girlfriend that had been reported to the DPD. At the conclusion of that investigation, Johnson signed a "last chance settlement agreement" with the Town, in which Johnson agreed that he would be subject to termination if he "engage[d] in the same or substantially similar conduct as the conduct described in the investigative report, or other serious misconduct supported by substantial evidence" and that any such "termination . . . would be ineligible for review . . . , except for whether the Town's actions were arbitrary, capricious, or unsupported by substantial evidence."

[2] Although the undisputed record shows that Johnson's counsel and the Town's counsel had agreed upon the limited production process, Johnson maintains that he never consented to participate in that process. Johnson also maintains that he "never provided verbal or written consent" to his counsel to release his or his household members' phone records to Clancy or the Town.

which Clancy requested the "phone record[s] [that] will be redacted" to "contain[]" only "information . . . regarding the identified phone numbers."

Pursuant to that limited production process, Johnson's counsel sent the Town's counsel an email that contained a link to a copy of Johnson's unredacted phone records for the requested time period. The Town's counsel replied to the email with a list of nine telephone numbers "that the Duxbury Police Department [was] interested in." Johnson's counsel then sent the Town's counsel an email that contained a link to a copy of Johnson's phone records. That copy had been redacted to show only the incoming and outgoing call information that pertained to the nine phone numbers that the DPD had earlier identified. The Town's counsel forwarded the link to Clancy.

In December 2017, Johnson filed an amended complaint in the United States District Court for the District of Massachusetts against the Town and Clancy. The complaint alleged, as relevant here, that the Town and Clancy had compelled Johnson to turn over his phone records and that this constituted an "illegal warrantless search" in violation of Johnson's federal constitutional rights.[3]

---

[3] Johnson also brought a claim under Massachusetts law against Clancy. On appeal, Johnson does not contest the District Court's grant of summary judgment to Clancy on that claim, so we do not address it.

The defendants moved for summary judgment. The District Court granted the defendants' motion, and Johnson timely appealed.

## II.

We review the grant of summary judgment de novo. See Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 558 (1st Cir. 2010). In undertaking that review, we "draw[] all reasonable inferences in favor of the nonmoving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013) (internal citations and quotation marks omitted). We may affirm only if the record reveals "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

Johnson brought federal constitutional claims under § 1983 against both Clancy and the Town. Clancy asserted qualified immunity on the ground that the record did not show that he had violated a federal constitutional right or that any such right was "clearly established." See Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Town, though not entitled to qualified immunity from § 1983 claims, asserted that the record did not show that the alleged conduct violated the federal Constitution or that it constituted the "execution of [the Town's] policy or custom." See Monell v.

- 6 -

Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 691, 694 (1978). On that basis, the Town asserted it could not be subject to liability under § 1983. See id.

The District Court granted summary judgment to both Clancy and the Town on the ground that the record did not show that Clancy had committed a federal constitutional violation. The District Court did so based on its conclusions that Clancy's order to Johnson to turn over his phone records was a reasonable "workplace search" under O'Connor v. Ortega, 480 U.S. 709, 725-26 (1987) (plurality opinion), and, alternatively, that Johnson validly consented to turning over his phone records. We, too, conclude that the order at issue did not violate the Fourth Amendment, although for different reasons. Accordingly, we affirm the judgment below. See Gerald v. Univ. of P.R., 707 F.3d 7, 27 (1st Cir. 2013) ("[W]e are . . . free to affirm a grant of summary judgment for any reason apparent in the record." (citing Jones v. Secord, 684 F.3d 1, 5 (1st Cir. 2012)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "'The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government,' without regard to whether the government actor is investigating crime or performing another function," City of

Ontario, Cal. v. Quon, 560 U.S. 746, 755-56 (2010) (quoting Skinner v. Railway Labor Execs. Ass'n, 489 U.S. 602, 613-14 (1989)), such as "act[ing] in its capacity as an employer," id. at 756 (citing Treasury Emps. v. Von Raab, 489 U.S. 656, 665 (1989)).

"The Fourth Amendment generally requires that the government obtain a warrant based on probable cause before conducting a search," United States v. Hood, 920 F.3d 87, 90 (1st Cir. 2019) (citing Katz v. United States, 389 U.S. 347, 362 (1967) (Harlan, J., concurring)), "with regard to those items ('persons, houses, papers, and effects') that it enumerates," United States v. Jones, 565 U.S. 400, 411 n.8 (2012). An "official intrusion into th[e] private sphere generally qualifies as a search," only where "an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable.'" Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).

But, "the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context." O'Connor, 480 U.S. at 715. A majority in O'Connor thus agreed that, even where an employee has a reasonable expectation of privacy in the workplace context, "'special needs, beyond the normal need for law enforcement' make the warrant and probable-cause requirement impracticable for

- 8 -

government employers." Quon, 560 U.S. at 756 (quoting O'Connor, 480 U.S. at 725). The District Court relied on the approach that the O'Connor plurality set out to evaluate the reasonableness of "searches" related to "legitimate investigations of work-related misconduct" and found that Clancy's request to Johnson for the phone records at issue was "reasonable in its inception and scope" and thus did not offend the Fourth Amendment.

On appeal, Johnson argues that the District Court should not have applied "the holding of O'Connor . . . to the circumstances of this case," because Clancy's request for "the records of private telephones registered to Johnson and used by him and his household members . . . went well beyond the workplace environment contemplated by O'Connor." Johnson thus contends that the request for his phone records constituted a "search" that required a warrant before it could be carried out.

We choose to bypass the dispute between the parties concerning "the appropriate standard of reasonableness," O'Connor, 480 U.S. at 715, however, because we conclude that the order for the phone records at issue did not implicate the Fourth Amendment. As O'Connor explained, a government employee's "Fourth Amendment rights are implicated only if the conduct of the . . . officials at issue . . . infringe[s] 'an expectation of privacy that society is prepared to consider reasonable.'" Id. (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)). Indeed, Johnson

- 9 -

acknowledges that he needed to have a reasonable expectation of privacy in the call records at issue in order to assert any Fourth Amendment interest in them.

Johnson asserts that "there is no dispute that" "the records of private telephones registered to Johnson and used by him and his household members" "enjoyed a reasonable expectation of privacy," presumably because they contained information pertaining to personal -- as opposed to work-related -- calls that he and his household members made and received.  But, we conclude that Johnson had no reasonable expectation of privacy in the phone records at issue.  See Stewart v. Evans, 351 F.3d 1239, 1243-44 (D.C. Cir. 2003) (Roberts, J.) (rejecting a government employee's Bivens claim that her government employer had violated the Fourth Amendment by taking certain documents from an office safe based on the threshold issue that the employee had no reasonable expectation of privacy in the safe or in the documents under the third-party doctrine).

Every circuit to have considered the question has held that an individual has no reasonable of expectation of privacy in a phone service provider's records of the phone numbers that he has dialed or from which he has received calls.  See, e.g., United States v. Clenney, 631 F.3d 658, 666-67 (4th Cir. 2011) (finding no reasonable expectation of privacy in "cellular phone records," even though the records include "basic information regarding

incoming and outgoing calls on that phone line"); United States v. Plunk, 153 F.3d 1011, 1020 (9th Cir. 1998) ("Under longstanding Ninth Circuit precedent, individuals possess no reasonable expectation of privacy in telephone records." (citing United States v. Lustig, 555 F.2d 737, 747 n.10 (9th Cir. 1977)); Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co., 593 F.2d 1030, 1045 (D.C. Cir. 1978) ("[S]ubscribers have no Fourth Amendment basis for challenging Government inspection of their toll records, since subscribers . . . have taken the risk in revealing their affairs to third parties that the information will be conveyed by that person to law enforcement officials . . . ."); Nolan v. United States, 423 F.2d 1031, 1044 (10th Cir. 1969) ("We fail to see how the Fourth Amendment is applicable to the keeping of telephone company records. There is no suggestion that these records represent anything other than records normally kept in the ordinary course of business on all customers' phones."); DiPiazza v. United States, 415 F.2d 99, 103–04 (6th Cir. 1969) ("[O]ne who uses a telephone to make long distance calls is not entitled to assume that the telephone company will require a warrant before submitting its records in response to an IRS summons.").

We see no reason to conclude otherwise. The decisions quoted above rely on what is known as the third-party doctrine, under which the United States Supreme Court has "held that a person has no legitimate expectation of privacy in information he

- 11 -

voluntarily turns over to third parties, . . . even if the information is revealed on the assumption that it will be used only for a limited purpose." Carpenter, 138 S. Ct. at 2216 (internal quotation marks omitted).

The Court first announced the third-party doctrine in United States v. Miller, 425 U.S. 435 (1976), where it held that a customer can "assert neither ownership nor possession" over bank records, including the customer's "original checks and deposit slips." Id. at 440, 442-43. The Court noted that "th[ose] documents . . . are not respondent's 'private papers'" but are instead "the business records of the banks." Id. at 440. Thus, the Court concluded, the customer can assert no reasonable expectation of privacy in those records after "tak[ing] the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." Id. at 443.

Soon thereafter, the Court relied on similar logic in Smith to hold that a phone user has no "'legitimate expectation of privacy' regarding the numbers he dialed on his phone" that are captured by a pen register. Smith, 442 U.S. at 742. That is because, the Court explained, "[t]elephone users . . . typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes." Id.

- 12 -

at 743.  Thus, the Court explained, "it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret." Id.  That is so even where an individual "dialed the number on his home phone rather than on some other phone," given that he "had to convey that number to the telephone company in precisely the same way."  Id.

Smith and Miller, therefore, comfortably support the conclusion that a phone subscriber has no reasonable expectation of privacy in the phone service provider's records of the numbers that the subscriber has dialed and from which the subscriber has received calls, just as the numerous circuits cited above have held.  There is no dispute that a phone service provider creates these call records "to memorialize its business transaction with the target, rather than simply recording its observation of a transaction between two independent parties."  In re Application of the United States for Historical Cell Site Data, 724 F.3d 600, 611 (5th Cir. 2013).[4]  After all, the records contain primarily

---

[4] The records at issue also contained information about the length of each incoming and outgoing call, as well as each call's "[r]ate [c]ode" and any associated "[a]irtime [c]harges" or additional charges.  Johnson does not appear to assert a privacy interest in these particular aspects of the information contained in the phone records at issue.  In any event, that information appears to be of a type that would provide a basis for concluding that it, too, "memorialize[s] [the provider's] business transaction with the target, rather than simply recording its

"addressing information, which the business needs to route those communications appropriately and efficiently."  Id.; see also United States v. Forrester, 512 F.3d 500, 511 (9th Cir. 2008) (noting that there is no reasonable expectation of privacy in "whatever information people put on the outside of mail" (citing Jacobsen, 466 U.S. at 114; United States v. Van Leeuwen, 397 U.S. 249, 251–52 (1970); Ex parte Jackson, 96 U.S. 727, 733 (1877))).[5] And, Johnson points to nothing in the record that would show "the existence of any agreement [by the provider] with its customers to keep their usage . . . records confidential" or that "the nature of the . . . records gave . . . customers [any] reason to expect that they would be kept confidential from the government."  United States v. Golden Valley Elec. Ass'n, 689 F.3d 1108, 1116 (9th Cir. 2012).

---

observation of a transaction between two independent parties." Id.

[5] By contrast, "[c]ommunications content, such as the contents of letters, phone calls, and emails, which are not directed to a business, but simply sent via that business, are generally protected."  In re Application of the United States for Historical Cell Site Data, 724 F.3d at 611; see also, e.g., Jacobsen, 466 U.S. at 114 ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable."); United States v. Warshak, 631 F.3d 266, 288 (6th Cir. 2010) ("The government may not compel a commercial [internet service provider] to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause." (emphasis added)).

- 14 -

Johnson does identify one possible ground of distinction from this body of precedent: Clancy asked Johnson, and not the phone service provider, for the call records at issue. To be sure, the undisputed record shows that the records that Clancy requested were to "be issued by the cell phone provider . . . in the normal format." And, the undisputed record shows that the records that were turned over were in fact obtained by Johnson from the provider.[6] But, Johnson nonetheless suggests that the fact that Clancy asked Johnson to first obtain a copy of the records at issue from the provider made them Johnson's "private property" and for that reason alone gave him a reasonable expectation of privacy in them.

Consistent with our decision in Alinovi v. Worcester Sch. Comm., 777 F.2d 776 (1st Cir. 1985), however, Johnson's receipt of a copy of those records from the provider did not subsequently establish any reasonable expectation of privacy in the phone call information contained in those documents.[7] Alinovi

---

[6] The undisputed record shows that Johnson obtained a copy of the phone records at issue from the carrier, that Johnson gave the records to his counsel, that Johnson's counsel scanned the copy of the records into a PDF format, that Johnson's counsel uploaded the PDF of the records to a Dropbox account that Johnson's counsel had created, and that Johnson's counsel sent an email with the Dropbox link to the copy of the records to the Town's counsel.

[7] Johnson does contend that Clancy "should have obtained th[e] information" at issue "through St. Peter's telephone records, which they could not have obtained without a warrant" and that "[b]y ordering Johnson to turn over his telephone records, Clancy may well have been attempting to circumvent the need for a

- 15 -

held that a public school teacher "could [not] have reasonably expected her [term] paper to remain private" after submitting the paper to her professor and to a school administrator and expressly rejected the argument that her "right [to privacy] was subsequently reinvoked when the paper was returned to her" because we concluded that she "had already frustrated her privacy expectation by voluntarily and unconditionally giving her paper . . . to her professor and [the school administrator]." Id. at 784-85. The same logic decides this case. Johnson should not reasonably have expected privacy in his phone service provider's call records, simply because he was in physical possession of a copy of them.

## IV.

For the foregoing reasons, we affirm the District Court's grant of summary judgment to the defendants. Each party shall bear its own costs.

---

warrant -- any warrant." He points to Clancy's testimony that he was "not . . . familiar with the means to secure a search warrant in a work-related matter." But, Johnson does not explain how the Fourth Amendment would have required Clancy to get a warrant before requesting the records at issue from St. Peter's or Johnson's phone service provider.