IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2015 Session

## STATE OF TENNESSEE v. MAURICE MCALLISTER

**Direct Appeal from the Circuit Court for Giles County**
**No. 15836    Stella Hargrove, Judge**

_____

**No. M2014-02022-CCA-R3-CD – Filed December 16, 2015**

_____

In 2012, a Giles County jury convicted the Defendant, Maurice McAllister, of rape, and the trial court sentenced him to twelve years of confinement. On appeal, the Defendant contends that the trial court erred when it: (1)  denied his motion to suppress his statements to police; (2) admitted evidence seized from his vehicle; and (3) imposed a twelve-year sentence to be served in confinement. The Defendant lastly contends that the cumulative effect of the errors at trial require a reversal of his conviction. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Robert D. Massey, Pulaski, Tennessee, for the appellant, Maurice McAllister.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Mike Bottoms, District Attorney General; Lawrence R. Nickell, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's sexual contact with minor victims at his home in Giles County, Tennessee. A Giles County grand jury indicted the Defendant for thirteen offenses, including one count of aggravated rape. The aggravated rape count was, by agreement of the parties, severed and the Defendant was tried in 2013 for one

count of the aggravated rape of one of the victims, L.H.S.[1]

## A. Pretrial Proceedings

Officers brought the Defendant to the Giles County Sheriff's office on May 1, 2012, where he spoke with the police in a recorded interview and admitted to sexual contact with the victim. Pretrial, the State sought to have the trial court rule that these statements were admissible at trial, and the Defendant sought to suppress his statements, contending that he gave them involuntarily. At the suppression hearing, the State played the approximately three-hour audio recorded interview. In the recorded interview, Investigator Mike Chapman identified himself and so did Agent Caleb Utterback. Agent Utterback told the Defendant that he was going to read the Defendant his *Miranda* rights, explaining that before the Defendant answered any questions, he must be read his rights. The Defendant replied, "Okay." Agent Utterback then read the Defendant his *Miranda* rights, after which the Defendant replied, "No, yeah, that's fine." The Defendant stated that he had "no idea" why the police were questioning him. Investigator Chapman told the Defendant that he "might consider" not talking to the police unless he planned to tell the truth. Investigator Chapman stated that he would "minimize [the Defendant's] exposure" as far as publicity if the Defendant told the truth, and the Defendant replied, "Sure I'll shoot you straight. If I can." Investigator Chapman told the Defendant that he was being accused of sexual contact by a group of young Amish people. He commented that the Amish community as a whole was not known for lying. He asked the Defendant how he wanted to "approach" the interview, and the Defendant replied, "Ask me questions."

Investigator Chapman asked the Defendant about his interactions with several of the young Amish people who accused him of sexual contact. The Defendant told Investigator Chapman about when he last saw or spoke to each of the victims, including L.H.S., and in what context. Investigator Chapman asked the Defendant about several different incidents where the victims were accusing him of inappropriate sexual contact. At one point, the Defendant said he could not recall the exact details of an incident, but said that he did not blame his inability to recollect on his age, which was 71 years old???. The Defendant remarked, "I'm in pretty good shape for my age."

Throughout the interview, the officers continued to ask the Defendant questions and he readily answered them. The interview went on much like a conversation, and at no point did the Defendant ask to leave or tell the officers that he did not want to answer their questions. The Defendant was offered a snack or a drink of water and the opportunity to take a break from the interview; he declined those offers. Later, the

---

1 It is policy of this Court to refer to minor victims and victims of sex crimes by their initials only.

Defendant asked to use the restroom, which the officers allowed him to do. The Defendant, at times, chuckled when he was talking and otherwise, he sounded comfortable during the interview. Based upon the Defendant's responses, he appears from the recording to understand the questions and the nature of the line of questioning.

Agent Wayne Wesson is heard entering the interview room and introducing himself to the Defendant. The Defendant and Agent Wesson discussed the Amish community and its practices, and the Defendant agreed he had a relationship with some of the Amish "kids." He agreed that some of the kids used to work at his home and identified several of them by name, including L.H.S. Agent Wesson stated that he believed the Defendant was not being completely truthful, and the Defendant denied this, insisting that he was being truthful about his interactions with the victims. About his veracity, he said to Agent Wesson, "I'm going to tell you how it is," and that if he testified "on the stand" he would say the same thing. The Defendant continued to answer their questions and recalled details of the incidents and offered to take a lie detector test to prove that he was telling the truth. He stated, "I don't want to be crucified but I did what I did." Agent Wesson asked the Defendant point blank if he stuck his finger in L.H.S.'s vagina, and he replied, "Yes." The Defendant tried to estimate when it happened and confirmed that it happened in the "shed" at his residence. The interview continued with more conversation between Agent Wesson and the Defendant about the Defendant's sexual interactions with the victims and the ages of the victims. The Defendant admitted having had sexual interactions with the victims.

Agent Caleb Utterback, an agent employed with the Tennessee Bureau of Investigation ("TBI"), testified that he and two other officers questioned the Defendant on May 1, 2012, about his relationship with L.H.S at the Giles County Sheriff's Department. Agent Utterback agreed that he did not "research" the Defendant's intelligence level or education background prior to the interview. Agent Utterback recalled that, at the end of the interview, the agents and the Defendant went to the Defendant's residence where a search warrant was executed. Their conversation with the Defendant at his residence was not recorded. The Defendant's wife was present during some or all of the conversation. Agent Utterback testified that he knew the Defendant was eighty-one years old at the time of the interview. He agreed that Investigator Mike Chapman told the Defendant that if he was honest during the interview, the agents would "try to minimize [the Defendant's] exposure" in relation to the case. Agent Utterback recalled that the Defendant asked him during the interview whether he was going to prison, and the agent did not answer.

Agent Utterback testified that, throughout the interview, the agents used investigative techniques to put the Defendant "at ease" and encourage him to talk about his relationship with L.H.S. Agent Utterback agreed that the Defendant stated, "I need a

3

psychologist," and Agent Utterback asked the Defendant to elaborate on his request. Based on the Defendant's answer, Agent Utterback felt that it was proper for the interview to proceed. Agent Utterback agreed that, even though the Defendant offered to take a lie detector test, no lie detector test was administered. Agent Utterback recalled that, midway through the interview, the district attorney made the decision to arrest the Defendant.

Agent Wayne Wesson testified that he was employed by the TBI and that he took part in the interview of the Defendant. He stated that he entered the interview room after the interview was already in progress. Agent Wesson agreed that, while interviewing the Defendant, he engaged in tactics to make the Defendant comfortable, such as saying that admitting his mistakes would show his good character. He agreed that he minimized the Defendant's sexual behavior, stating that he had also "experimented" as a young man, to make the Defendant more comfortable and open to speak about his involvement with the victim. Agent Wesson stated that he asked the Defendant whether he owned a gun based on L.H.S.'s allegation that the Defendant had threatened her with a pistol. Agent Wesson testified that he was aware of the Defendant's age and employment history before the interview began.

On cross-examination, Agent Wesson testified that the Defendant seemed "alert" during the interview.

Based upon this evidence, the trial court denied the Defendant's motion to suppress his statement. The trial court made the following statement:

> [T]he Court is going to address . . . the [D]efendant's motion to suppress his statement. And we've been listening to this statement for several hours. The Court has tried to listen very carefully. I think the thrust of the [D]efendant's argument is that considering certain factors, primarily age, the officers not knowing his full background of education, and his work experience, and so on; [the Defendant argues that in] totality, the statement is inadmissible as not being voluntarily given by the [D]efendant. . . . .
>
> Once they entered the [interview] room, [Investigator] Mike Chapman said a few things, I believe it was Agent Utterback that read the rights to [the Defendant.] I thought he read them very clearly and concise. And the [D]efendant immediately said, "That's fine." And then they get into some questions on the part of Investigator Chapman as to, "How do we want this to go?" And I took that to mean the format as to how things would go as to the questions and answers, and that sort of thing. And the

4

[D]efendant clearly spoke up and said, "Ask me questions."

. . . Now in listening to the [Defendant's] statement, it's this Court's position that [the Defendant] understood the questions. I don't remember any, if any, he asked to be repeated. He responded quickly. He is forthcoming. He's helpful even, and says he wants to be helpful. At one point, he says, "I just want this to go away. You don't see me shaking or nervous here." And then he talks about "I'm in pretty good shape. I hope this doesn't screw up my trip to the Kentucky Derby." And he talks about he'll always be honest with the officers' questions. And then he gives his answers throughout these three hours or so, he hedges to a certain extent and qualifies his answers. . . . .

This statement clearly is very damaging to the [D]efendant, but it will come into evidence. The Court finds that it was voluntarily, freely, understandingly, intelligently given throughout. . . . .

## B. Trial

At the Defendant's trial, Agent Utterback testified that he had been a TBI agent for four and a half years and assisted the Giles County Sheriff's Department with its investigation of this case. His involvement with the investigation began on April 30, 2012, when he met with other investigators from Giles and Lawrence Counties after they had received a call that the Defendant had sexually assaulted a minor. The following day, May 1, 2012, the Giles County Sheriff's office received a call that there was an "unwanted visitor" at the victim's home, who turned out to be the Defendant. Sheriff's deputies responded to the victim's home and brought the Defendant back to the sheriff's office, where he was interviewed by sheriff's deputies and TBI agents. The audio recorded interview was admitted as evidence and played for the jury. The recording of the approximately three-hour interview was abridged into ten excerpts of the interview. In the first excerpt, Investigator Mike Chapman identified himself and stated that the date was May 1, 2012. Agent Caleb Utterback identified himself and read to the Defendant his *Miranda* rights. The Defendant acknowledged his understanding of his rights and agreed to talk with the officers. The Defendant stated that he had no idea why he was being questioned.

In the second excerpt, Investigator Chapman asked the Defendant if he threatened the victim, L.H.S., and told her he would kill her if she told anyone about the sexual contact. The Defendant agreed that he did tell the victim not to say anything about him touching her. In the third excerpt, the Defendant again said that he told L.H.S not to tell anyone about him "touching her breast." He denied threatening her. In the fourth

excerpt, the Defendant stated he had never carried a pistol in his pocket, although he did have a pistol at home and a permit for it. The Defendant stated that his pistol was black. In the fifth excerpt, the Defendant again denied threatening anybody. He stated that his pistol was a .38 caliber Smith and Wesson. In the sixth excerpt, Agent Wesson was present and the Defendant maintained to him that the "gun part" of L.H.S.'s story was untrue. He offered to take a lie detector test. He stated that he told L.H.S. that "it" was a secret.

In the seventh excerpt, the Defendant said he did not know the date of L.H.S.'s birthday. Agent Wesson told the Defendant that L.H.S. was accusing the Defendant of putting his finger inside her on her birthday, and the Defendant responded, "Well I have no idea when her birthday is." The Defendant said that L.H.S. had several boyfriends and had a relationship with another female. Agent Wesson asked the Defendant, "[D]id you stick your finger in her at one time?" and the Defendant replied, "Yeah." The Defendant said that it happened two and a half or three years prior. He agreed that he stuck his finger in her vagina and said that L.H.S was "okay with it." The Defendant said that they were out in a shed when it happened.

In the eighth excerpt, the Defendant said that the "threat" part of L.H.S.'s story bothered him. In the ninth excerpt, the investigators asked the Defendant if L.H.S.'s claim that the incident happened in 2004 was correct. The Defendant replied, "I wouldn't think it'd be that far back." The Defendant said he could not remember when his contact with L.H.S occurred, but "maybe it was" 2004. In the tenth excerpt, the Defendant said, "the only thing that anybody's lied about is me threatening somebody and [that I] had a gun. No way."

Agent Utterback testified that he prepared the search warrant for the Defendant's residence, which included the shed on the property and any vehicles. TBI agents and sheriff's deputies executed the search warrant on the Defendant's residence, and they photographed multiple weapons found inside, including pistols and handguns. Photographs of the weapons were admitted as evidence. During the search, Detective Utterback did not find a small silver pistol like the pistol described by the victim. Detective Utterback recalled that he searched three vehicles on the property, including a white Ford Expedition belonging to the Defendant. Inside the vehicle in the rear cargo compartment, investigators found an envelope containing pubic hair, Viagra, and condoms. Photographs of those three items were admitted as evidence. Detective Utterback testified that, while at the Defendant's residence, Agent Wesson interviewed the Defendant's wife.

Agent Wesson, a TBI Special Agent, testified that, when he arrived at the sheriff's office on May 1, the interview with the Defendant was already in progress. He stated that

he interviewed the Defendant's wife at the residence she shared with the Defendant later that day. While at the Defendant's residence, Agent Wesson showed the envelope containing the hair to the Defendant, and the Defendant said that he had taken pubic hair from L.H.S. in the past. The Defendant told Agent Wesson that L.H.S had cut her own pubic hair and that he had kept it. Agent Wesson testified that the Defendant admitted to putting his finger inside L.H.S.'s vagina.

On cross-examination, Agent Wesson stated that, for the majority of the interview, only he and the Defendant were present, although other investigators came and went throughout. He agreed that he took a written statement from the Defendant's wife. Agent Wesson recalled that he had information that the Defendant had threatened L.H.S. with a small, silver pistol, and the Defendant's wife confirmed that she owned a pistol matching that description.

Dianne McAllister, the Defendant's wife, testified that she had been married to the Defendant for fifty-two years. She testified that they were "familiar" with the Amish people and that they had gotten to know them, in part, because they bought vegetables from them. She agreed that she and the Defendant kept guns in their home. She agreed that they had a small pistol, but she said that it was black, not silver.

On cross-examination, Mrs. McAllister testified that she and the Defendant had thirty acres of land that they cared for themselves, along with the help of some girls from the Amish community, one being L.H.S. L.H.S. and another girl helped the McAllisters with weeding, painting, raking leaves, and working in the flower beds. Mrs. McAllister stated that she and the Defendant had a "friendly" relationship with the girls and that they visited each other's homes and exchanged gifts. Mrs. McAllister recalled that L.H.S. came to their home and was curious about the modern appliances and amenities that she did not have in the Amish community. The McAllisters paid L.H.S. to do work at their house for a number of years.

L.H.S. testified that she was twenty-five years old and married at the time of trial. L.H.S. testified that she met the Defendant when she was twelve years old, and she specifically recalled seeing him on her sixteenth birthday in September 2004. On that occasion, L.H.S. saw the Defendant in the "wash-house" at her parents' home, a room where her family did laundry and cooked meals. The Defendant came inside the "wash-house" while she was cooking and hugged her. The Defendant then "reached on [her] breast" on the outside of her dress while she "just stood there." L.H.S. testified that she did not want the Defendant to touch her, but she did not protest because she "knew he was going to hurt [her]" if she did. She explained that the Defendant had shown her his pistol in the past and said he would kill her if she told anyone about his physical contact with her. L.H.S. testified that the Defendant then opened his pants and began

masturbating in front of her and ejaculated. The Defendant told L.H.S. to look at his penis while he was masturbating. Next, the Defendant reached up under L.H.S.'s dress and put his finger in her vagina. L.H.S. reiterated that she did not stop him because she was afraid he had the pistol she had seen previously. She described the pistol he threatened her with as a small, silver gun that fit into the Defendant's pocket. The Defendant told her during this incident to remember that he had the pistol in his pocket and that he would use it on her if she told anyone.

L.H.S. testified that on a different occasion the Defendant gave her a pair of scissors and told her to go into the "wash-house" and cut some of her pubic hair to give to him.

On cross-examination, L.H.S. stated that she and her sisters sometimes worked for the McAllisters. She agreed that the McAllisters had visited her family's home on occasions and said that they sometimes brought gifts. L.H.S. agreed that in the Amish community having sexual contact with someone would be punishable through a process called "shunning."

L.H.S. agreed that she did not see a pistol on the day the Defendant touched her in the "wash-house," but she reiterated that he told her he had one and threatened to shoot her with it. L.H.S. stated that she kept working for the Defendant after the incident because she did not want her parents to find out about the incident in the "wash-house." L.H.S. recalled that, at some point, the Defendant gave her and her siblings costumes to dress up in, and he took pictures of them.

The State rested its case, and the defense called Investigator Tim Scott as its first witness. Investigator Scott testified that he served as the evidence custodian at the Giles County Sheriff's office and took part in the search of the Defendant's residence. He confirmed that, during the search, investigators were looking for guns and that they did not find a small, silver pistol inside the residence.

Investigator Mike Chapman testified that he was employed by the Giles County Sheriff's office and that he interviewed the Defendant on May 1, 2012. He testified that he began the interview in the presence of Agent Utterback until Agent Wesson took over the interview. Investigator Chapman recalled that L.H.S.'s father called police when the Defendant showed up at his house, and officers subsequently brought the Defendant to the sheriff's office where he gave an audio recorded statement. Investigator Chapman testified that Agent Utterback administered *Miranda* warnings to the Defendant.

Tyler Ultsch testified that he had been friends with the Defendant since 1985 and was engaged to marry the Defendant's daughter. The Defendant's son had worked for

8

him in the past. Mr. Ultsch and his fiancé had visited the Defendant in Tennessee approximately twelve times, and, during their visits, they had visited L.H.S.'s home. He specifically recalled a visit in March of 2012 when he met L.H.S. Mr. Ultsch testified that L.H.S. did not appear afraid of the Defendant but was laughing and talking with him. He stated that he had never seen the Defendant with a pistol like the one described by L.H.S.

Debbie Lewis testified that she was the Defendant's daughter and lived in Oregon with her fiancé. Ms. Lewis stated that she visited the Defendant in Tennessee several times a year. She testified that the Defendant owned guns, including several pistols. She testified that she had visited with L.H.S. and her family and that L.H.S. never seemed afraid of the Defendant. Ms. Lewis denied that the Defendant owned a small, silver pistol similar to the one described by L.H.S.

At the conclusion of the evidence, the jury convicted the Defendant of the lesser-included offense of rape.

## C. Sentencing

At the Defendant's sentencing hearing, the presentence report was admitted as evidence. Attached to it was a victim impact statement. Also admitted as evidence were multiple letters written in support of the Defendant, a "Neuropsychological Evaluation Report" prepared by Dr. James Walker, and a "Comprehensive Psychosexual Evaluation" prepared by Dr. John Lancaster. L.H.S. testified that, as a result of the Defendant's conduct, she could not sleep and sometimes would throw up. She stated that this occurred more frequently when she was younger, closer to the date of the offense. L.H.S. testified that she was afraid of the Defendant and worried that he would take advantage of her. L.H.S. stated that she was undergoing counseling and that she worried someone would sexually molest her children.

The trial court sentenced the Defendant to twelve years' incarceration. In doing so, the trial court noted the Defendant's "social history," his advanced age, that he had no prior criminal history, his prior military service, and his ongoing medical issues. The trial court acknowledged the Defendant's statements of remorse for the offense but stated that it had trouble reconciling the Defendant's other statement that the contact was consensual. The trial court stated that it considered the "actions and character of the Defendant" as well as the letters written on behalf of the Defendant.

With respect to enhancement and mitigating factors, the trial court found and gave "great weight" to the fact that "the Defendant ha[d] a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the

appropriate range." The trial court also applied the enhancement factor that "the offense involved a victim and was committed to gratify [the Defendant's] desire for the pleasure or excitement" and also gave it "great weight." The trial court considered as a mitigating factor the fact that the Defendant had cooperated with law enforcement and admitted to his offenses.

In consideration of the Defendant's potential for rehabilitation, the trial court further noted Dr. Lancaster's conclusion that the Defendant was a "moderate risk to reoffend" and both doctors' conclusions that the Defendant should be restricted from contact with minors or other vulnerable individuals. The trial court also noted the Defendant's "inability to report truthfully about inappropriate behaviors," in reference to the Defendant's claim that his contact with L.H.S. was consensual. Thus, the trial court found that incarceration served the interests of society by protecting society from the Defendant's possible future criminal conduct. The trial court found that the Defendant did not appreciate the seriousness of the offense and that imposing an alternative sentence would depreciate the seriousness of the offense. Finally, the trial court found that incarceration would serve as an effective deterrent to prevent the Defendant from committing similar offenses.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it: (1) denied his motion to suppress his statements to police; (2) admitted evidence seized from his vehicle; and (3) imposed a twelve-year sentence to be served in confinement. The Defendant also contends that the cumulative effect of the errors at trial require a reversal of his conviction. We address each of the Defendant's arguments in turn.

### A. Motion to Suppress

The Defendant contends that the trial court erred when it denied his motion to suppress his statements to Agent Wesson, Agent Utterback, and Investigator Chapman. He contends that the totality of the circumstances, specifically his age, his lack of experience with the criminal justice system, the length of the interview, the interviewers' techniques, and the interviewers' "failure to answer his questions about whether he [was] about to be arrested" establishes that his statement was not voluntary. The State responds that the evidence presented at the suppression hearing established that the Defendant's statement was voluntary. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will

be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to individuals accused of criminal activity, thus necessitating our examination of the voluntariness of a statement taken during custodial interrogation. *State v. Northern,* 262 S.W.3d 741, 763 (Tenn. 2008). Specifically, for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .'" *State v. Smith,* 933 S.W.2d 450, 455 (Tenn. 1996) (quoting *Bram v. United States,* 168 U.S. 532, 542-43 (1897)). In other words, "the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer,* 400 S.W.3d 537, 568 (Tenn. 2013). No single factor, however, is necessarily determinative. *State v. Blackstock,* 19 S.W.3d 200, 208 (Tenn. 2000) (citing *Fairchild v. Lockhart,* 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)). Further, "[a] trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." *State v. Keen,* 926 S.W.2d 727, 741 (Tenn. 1994).

"Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id.* (citing *State v. Brimmer,* 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear [defendant]'s will to resist and bring about confessions not freely self-determined.'" *Id.* (quoting *Rogers v. Richmond,* 365 U.S. 534, 544 (1961)); *see State v. Kelly,* 603 S.W.2d 726, 728 (Tenn. 1980). The question must be answered with "complete disregard" of whether the defendant was truthful in the statement. *Phillips,* 30 S.W.3d at 377 (citing *Rogers,* 365 U.S. at 544).

The evidence presented at the hearing does not preponderate against the trial court's finding that the Defendant's statement was given voluntarily. The evidence presented by the State at the suppression hearing was the three-hour audio recording and the interviewing officers' testimony. Agent Utterback testified that he advised the Defendant of his *Miranda* rights, which was also heard in the audio recording. In the recording, the Defendant expressed his willingness to talk to investigators and continued to do so for several hours without any indication that he did not wish to be questioned or that he wanted the interview to end. The Defendant was forthcoming and stated specifically that he was willing to answer the officers' questions. Throughout the recording, there was no indication by the Defendant that he was not participating in the interview voluntarily.

The Defendant contends that his statement was not voluntary because officers did not research the Defendant's intelligence level or age before questioning him and then engaged in various tactics to encourage the Defendant to be comfortable and talk to them, amounting to coercion. We disagree. The Defendant's advanced age and ignorance about the criminal justice system does not necessarily amount to his statement being involuntarily. *See State v. Rosa*, 996 S.W.2d 833, 838 (Tenn. Crim. App. 1999) (citing *Harris v. Riddle,* 551 F.2d 936, 939 (4th Cir. 1977) (concluding that "[w]hen the police have fully and fairly given a suspect the *Miranda* warnings their duty is discharged, and we hold that they are under no further and additional duty whether or not the suspect acts wisely or foolishly or misapprehends either the facts or the law"). Furthermore, a defendant's "illiteracy, mental disability, and educational background . . . do not, in and of themselves, render [a] statement involuntary. Rather, they constitute factors for the trial court to consider in evaluating the totality of the circumstances." *State v. Anthony Draine*, No. W2013-02436-CCA-R3-CD, 2015 WL 1932273, at *6 (Tenn. Crim. App., at Jackson, April 29, 2015) (citing *State v. John Philip Noland*, No. E2000-00323-CCA-R3-CD, 2000 WL 1100327, at *6 (Tenn. Crim. App., at Knoxville, Aug. 3, 2000)).

The Defendant has not presented evidence to show that the officers' questions or tactics, reviewed in the totality of the circumstances, were such as to overbear the Defendant's will to bring about a statement that was the product of coercion. The Defendant gave his statement after being read his *Miranda* rights. He was not mistreated, threatened, or treated disrespectfully by the questioning officers. The Defendant told Agent Wesson that he was in "good shape" for his age, and repeatedly denied needing a break from questioning or needing food or water during the three-hour interview. We conclude, as did the trial court, that the Defendant's statement was voluntarily given. The Defendant is not entitled to relief.

## B. Admissibility of the Evidence

The Defendant next contends that the trial court erred when it admitted certain items found in the search of his vehicle into evidence at trial: the envelope containing the pubic hair, the Viagra, and the condoms. He contends that there was no proof that the condoms or Viagra were ever used and no proof that the pubic hair had come from the victim. He argues that none of this evidence was relevant to the charged offense of aggravated rape. In the alternative, the Defendant argues that any of the items deemed relevant were more prejudicial than probative. The State responds that the envelope of pubic hair was particularly probative as corroborative of the victim's testimony and was not unfairly prejudicial. As to the condoms and Viagra, the State contends that the items were evidence of the Defendant's interest in sexual activity and that, even if the trial court abused its discretion in admitting them, the error was harmless.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. *State v. James,* 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'Excluding relevant evidence under Tennessee Rule of Evidence 403 is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *James,* 81 S.W.3d at 757-58 (quoting *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted)).

Generally, the admissibility of evidence rests within the sound discretion of the trial court, and this Court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. *State v. Franklin,* 308 S.W.3d 799, 809 (Tenn. 2010). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.*

We first turn to the admissibility of the envelope containing the pubic hair. The

trial court found that it was relevant and that the probative value substantially outweighed the prejudicial effect. We similarly conclude that it was relevant, given the victim's testimony that the Defendant gave her a pair of scissors and told her to cut her pubic hair to give to him. The envelope containing the hair corroborates this testimony. The Defendant admitted to investigators that the pubic hair was the victim's. Even if the evidence meets the test of relevance, however, Tennessee Rule of Evidence 403 may still justify exclusion of such evidence. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We conclude that, as this evidence was directly linked to the victim's testimony, its introduction aided the jury in determining the credibility of the victim's testimony. In our view, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court properly admitted this evidence.

As to the Viagra and condoms, the State concedes in its brief that these items are prejudicial and have "little probative value taken alone," however, the State argues that their presence with the envelope of pubic hair confirms the "sexual nature of the [D]efendant's retention of victim's hair." Although the Defendant admitted that he had sexual contact with the victim, there were discrepancies in his statements and between his account and the victim's account. Additionally, the State had the burden at trial of introducing relevant evidence from which a jury could conclude beyond a reasonable doubt that the Defendant sexually assaulted the victim.

We conclude that the Viagra and the condoms, both sexual in nature, and found in close proximity to the pubic hair, are relevant evidence concerning whether or not the Defendant sexually assaulted the victim. We agree with the State that these items, found with the victim's pubic hair, add relevance to the pubic hair and make it more probable than not that the Defendant was capable of sexual assault, which was a part of the jury's consideration. *See* Tenn. R. Evid. 401. In our view, the probative value of these items, taken in the context of their presence with the victim's hair, is not outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant next contends that his sentence is "inappropriate" on multiple grounds. He argues that the trial court misapplied the sentencing principles, particularly when it applied the enhancement factors without providing a rationale as to how the factors were weighed and apportioned. The Defendant contends that a nine-year sentence would be appropriate and requests that he be granted an alternative sentence. The State responds that the Defendant has a "significant history" of criminal behavior to support

the trial court's application of the enhancement factor, and thus, his sentence is proper.

The Defendant was sentenced for his 2004 crime under the terms of the 1989 Sentencing Act prior to the 2005 amendments and therefore, we review his challenge to the sentence under our previous standard of review. Under that standard, when considering a challenge to the length, range, or manner of service of a sentence, this court conducts a *de novo* review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (1997); *see also State v. Carter,* 254 S.W.3d 335, 342 (Tenn. 2008) (stating that "prior to 2005, the Sentencing Act set forth a 'presumptive sentence' to be imposed within the applicable range: the minimum sentence for all felonies other than Class A felonies, and the midpoint sentence for Class A felonies.) The presumption of correctness "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Carter,* 254 S.W.3d at 344-45 (quoting *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991)). The appealing party, in this case the Defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, *Sentencing Comm'n Cmts.*; *see also Carter,* 254 S.W.3d at 344; *Ashby,* 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely *de novo. Ashby,* 823 S.W.2d at 169.

Under the law prior to the 2005 amendments to our Sentencing Act, our supreme court had held that a trial court's enhancement of a defendant's sentence above the presumptive sentence on the basis of judicially determined facts, other than a defendant's prior convictions or admissions, violated that defendant's constitutional rights under the Sixth Amendment to the United States Constitution. *State v. Gomez,* 239 S.W.3d 733, 740 (Tenn. 2007); *see also Blakely v. Washington,* 542 U.S. 296, (2004). We note that the wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence. *State v. Gillard,* No. W2002-01189-CCA-R3-CD, 2003 WL 22446353, at *5 (Tenn. Crim. App., at Jackson, Oct. 21, 2003) (citing *State v. Winfield,* 23 S.W.3d 279, 284 (Tenn. 2000)).

In the present case, the trial court applied the enhancement factor that "the offense involved a victim and was committed to gratify [the Defendant's] desire for the pleasure or excitement" and gave it "great weight." We conclude that the application of this enhancement factor was error, as its application was based on "judicially determined facts" and thus violated the Defendant's constitutional rights. *See Gomez,* 239 S.W.3d at

740. However, the trial court also applied the enhancement factor that "the Defendant ha[d] a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." The State contends in its brief, and we agree with its contention, that the evidence provided to the trial court at the sentencing hearing contains sufficient facts from which the trial court could determine that the Defendant had a significant history of criminal behavior by having sexual contact with minors. The evidence includes the Defendant's admissions, the presentence report, which contains allegations of the Defendant's sexual contact with multiple minor victims and Dr. Walker's report, submitted by the Defendant, in which Dr. Walker summarizes the Defendant's accounts of the multiple sexual behaviors he engaged in with the victim and her minor siblings. Based on this evidence in the record, we conclude that the trial court properly applied this enhancement factor and properly sentenced the Defendant.

Because we have determined that the Defendant's twelve-year sentence in confinement for his rape conviction is proper, we conclude that he is ineligible for probation. *See* T.C.A. § 40-35-303(a). The trial court considered the Defendant's suitability for an alternative sentence and determined, based on the evidence, that an alternative sentence would depreciate the seriousness of the offense, *see* T.C.A. § 40-35-103(1)(B), and that the Defendant was not forthcoming about the nature of his relationship with L.H.S. *State v. Jamarcus Sydnor*, No. M2009-00947-CCA-R3-CD, 2010 WL 271183, at *5 (Tenn. Crim. App., at Nashville, Jan. 25, 2010) (stating that "The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation.") (citing *State v. Nunley,* 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *see also State v. Bunch,* 646 S.W.2d 158, 160-61 (Tenn. 1983); *State v. Zeolia,* 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); *State v. Williamson,* 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995)). We conclude, based on the evidence in the record that the trial court did not err when it declined to impose an alternative sentence because the Defendant was ineligible. The Defendant is not entitled to relief.

### D. Cumulative Error

Finally, the Defendant contends that the cumulative effect of the alleged errors requires that the case be reversed because he was denied his right to a fair trial. Having considered each of the Defendant's issues on appeal and concluding that the trial court did not err, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the

judgment of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE