**UNITED STATES of America, Appellant,**

v.

**John MATURO, Defendant,**

**Joseph Samuel Pontillo, Defendant–Appellant.**

No. 422, Docket 92–1265.

United States Court of Appeals, Second Circuit.

Submitted Nov. 17, 1992.

Decided Dec. 16, 1992.

Maurice H. Sercarz, New York City, for defendant-appellant.

Bradley D. Simon, Asst. U.S. Atty., E.D. of N.Y. (Andrew J. Maloney, U.S. Atty., James Orenstein, Asst. U.S. Atty., E.D. of N.Y., of counsel), for appellant.

Before: PRATT, ALTIMARI, and HEANEY *, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Joseph Samuel Pontillo appeals from a judgment entered after a jury trial in the United States District Court for the Eastern District of New York (Sterling Johnson, Jr., Judge), convicting him of conspiring to import and knowingly and intentionally importing in excess of one kilogram of heroin in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(A), and 963 (1988). Pontillo was sentenced to concurrent prison terms of 312 months on each count, to be followed by five years of supervised release.

On appeal, Pontillo principally contends that his conviction should be reversed because the district court erred in admitting evidence gathered through electronic surveillance by the Turkish National Police ("TNP"), which Pontillo argues was obtained in violation of his Fourth Amendment rights. Specifically, Pontillo argues that the TNP was acting either as an agent of the United States when it conducted the wiretap, or was involved in a "joint venture" with United States law enforcement officials to a degree which mandates their adherence to our constitutional protections for the conduct of wiretap surveillance. Pontillo also argues that the district court's findings of fact in support of the guidelines calculation were clearly erroneous because he was not reasonably capable of produc-

* The Honorable Gerald W. Heaney, Senior Circuit Judge of the Eighth Circuit, sitting by desig-

nation.

ing twenty-four of the kilograms of heroin included in the PSR's calculation.

For the reasons set forth below, we affirm the conviction, but vacate and remand for resentencing.

## BACKGROUND

In March 1989, the Drug Enforcement Agency ("DEA"), commenced a physical surveillance of Pontillo based on information provided by the New York Port Authority Police suggesting that Pontillo was involved in drug smuggling. In the course of this surveillance, DEA agents observed Pontillo driving with co-defendant John Maturo to various locations in Brooklyn where calls would be made or received. As part of this investigation, the DEA subpoenaed Pontillo's home telephone records, and found that a number of calls had been made to Turkey. This information was forwarded to the TNP. An investigation by the TNP revealed that the Turkish telephone numbers called by Pontillo belonged to individuals who were known narcotics traffickers already under investigation by the TNP.

On November 8, 1989, in accordance with Turkish procedures, the TNP sought and obtained permission from a Turkish court to wiretap the telephone numbers obtained from the DEA. The electronic surveillance commenced on November 9, 1989, and continued until December 8, 1989. During the course of this surveillance, the TNP intercepted several conversations in English between Pontillo and Turkish narcotics traffickers. The TNP sought the assistance of DEA agents in translating these conversations into Turkish. At all times the DEA was provided with immediate access to the TNP tape-recordings of these conversations, and routinely made copies of these tapes. These tapes were distributed to DEA agents in Turkey and the United States.

After reviewing the tapes provided by the TNP, the DEA obtained a subpoena for the credit card records of Pontillo and his common-law wife, Rose LaRocca. LaRocca's credit card bill for November 1989 included a receipt from a hotel in Istanbul, Turkey bearing the signature of "Sam Pontillo." The DEA also obtained a copy of a round-trip airline ticket issued in the name of "S. Pontillo" for travel from New York to Istanbul on November 1, 1989, with a return on November 8, 1989. This evidence suggested that Pontillo had traveled to Turkey on November 1, 1989, for the purpose of procuring amounts of heroin in excess of one kilogram. Indeed, in a telephone conversation intercepted in Turkey on November 11, 1989, between Pontillo and an individual identified as Ahmet, Pontillo complained that he was having difficulty selling the approximately two kilograms of heroin that he had brought back from Turkey because of its poor quality. The next day, November 12, 1989, Pontillo again phoned Ahmet to inform him that he planned to return to Turkey later that month to purchase more heroin. In this conversation Pontillo indicated that he was interested in purchasing four kilograms of heroin which Ahmet presently had available, but that Pontillo also wished to purchase an additional twenty kilograms of higher purity heroin that he could mix with the four kilograms of lower quality heroin.

In subsequent conversations with Ahmet, Pontillo continued to complain about the quality of the heroin he had imported. Pontillo indicated in these conversations that his delay in returning to Turkey to purchase additional heroin was attributable to the difficulties Pontillo was experiencing in selling the heroin he had previously imported.

Based on this information and further investigation, defendant was indicted on January 30, 1991. Pontillo was charged with conspiracy to import, and intentionally importing into the United States in excess of one kilogram of heroin, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(A) and 963.

At a pre-trial hearing, counsel for Pontillo moved to suppress the Turkish tape recordings on the ground that the TNP was acting as an agent of the United States government when it made the tape recordings. Therefore, according to Pontillo, the wiretaps should have been obtained in compliance with the Fourth Amendment of the

United States Constitution. The district court rejected this argument, finding that the decision to initiate a wiretap in Turkey was "the sole decision of the Turkish National Police." The court took note of the cooperation between the DEA and the TNP, as well as the fact that the DEA provided money, information and wiretapping equipment to the TNP, but found that these factors did not make the TNP an agent of the United States. The district court also determined that the cooperation between the TNP and the DEA in conducting their investigations did not constitute a joint venture. Finally, the court found that while Turkish wiretap procedures did not mirror those of the United States, there was no evidence of any conduct by the TNP which would "shock the conscience of the court." The court concluded, therefore, that the conduct of the Turkish officials did not fall within the ambit of the Fourth Amendment.

On February 4, 1992, after an eight-day jury trial, Pontillo was convicted on all counts of the indictment. Because the Probation Department determined that Pontillo was negotiating the purchase of an additional twenty-four kilograms of heroin, it included this amount with the heroin he had already imported in its calculations. In accordance with U.S.S.G. § 2D1.1(a)(3), this resulted in a base level offense of 36. The Probation Department's Presentence Report ("PSR") found that there were no adjustments to the defendant's offense level. Consequently, Pontillo was sentenced on the basis of an adjusted offense level of 36 and a criminal history category of IV. This yielded a sentencing range of between 262 and 327 months. On April 28, 1992, defendant was sentenced to 312 months imprisonment on each count, to be served concurrently, followed by five years of supervised release and a $100 special assessment.

Pontillo now appeals.

## DISCUSSION

### I. *Motion to Suppress Evidence of the Taped Conversations*

■ On appeal, Pontillo principally contends that the district court erred in denying his motion to suppress because the procedures authorizing the TNP to conduct the electronic surveillance fell short of Fourth Amendment standards. Pontillo's claim is premised on the notion that the TNP was acting either as an agent of the United States when it conducted the wiretap, or was involved in a "joint venture" with the DEA to a degree which mandates adherence to constitutional protections for the conduct of wiretap surveillance.

When conducted in this country, wiretaps by federal officials are largely governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *see* 18 U.S.C. §§ 2510–2520, which does not apply outside the United States. *See Stowe v. Devoy,* 588 F.2d 336, 341 (2d Cir.1978), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979). Pontillo therefore challenges the propriety of the TNP wiretaps on the basis of the Fourth Amendment doctrine relating to the participation of United States officials in foreign investigations. Thus we look to our relevant Fourth Amendment precedents, involving both wiretap and nonwiretap situations.

■ At the outset, we note that wiretap evidence may be admissible when foreign officials, acting on their own to enforce foreign law, properly follow their own law in obtaining the evidence, *see e.g., United States v. Cotroni,* 527 F.2d 708, 711–712 (2d Cir.1975), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976), even where the subject of the foreign search is an American citizen. *See United States v. Morrow,* 537 F.2d 120, 139 (5th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977).

■ As Pontillo correctly notes, however, this Court has recognized two circumstances where evidence obtained in a foreign jurisdiction may be excluded. First, where the conduct of foreign officials in acquiring the evidence is " 'so extreme that they shock the judicial conscience' a federal court in the exercise of its supervisory powers can require exclusion of the evi-

dence so seized." *Stowe,* 588 F.2d at 341. Second, where cooperation with foreign law enforcement officials may implicate constitutional restrictions, evidence obtained by foreign officials may be excluded. *United States v. Paternina–Vergara,* 749 F.2d 993, 998 (2d Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). Pontillo concedes that the conduct of the TNP was not so extreme as to shock this Court's conscience, and, therefore, relies on the latter category.

██ Within the second category for excluding evidence, constitutional requirements may attach in two situations: (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials, *see United States v. Busic,* 592 F.2d 13, 23 n. 7 (2d Cir.1978); or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials. *See United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir.) *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 134, 78 L.Ed.2d 128 (1983).

Here the district court made a finding that the TNP was not acting as an agent of the DEA in initiating the wiretaps. This finding is examined under the clearly erroneous standard of review. *See, e.g., United States v. Dyman,* 739 F.2d 762, 769 (2d Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985). Pontillo contends that several factors compel the conclusion that the TNP was acting as an agent for the DEA. First, the TNP commenced the wiretap surveillance soon after the DEA requested the background information on the Turkish telephone numbers. Second, prior to this request, the TNP had never wiretapped these phones, even though it was purportedly investigating these numbers. Third, Pontillo asserts that the DEA tacitly requested a wiretap. Finally, Pontillo contends that the claim that the TNP was conducting an independent investigation is merely a pretext concocted to avoid constitutional restrictions. This final claim is bolstered by the govern-

ment's concession that any evidence obtained from the wiretaps would be inadmissible in a Turkish court, and the fact that the TNP never acted on the information it obtained.

Conversely, several factors strongly militate against a finding of agency. Perhaps most significantly, the TNP sought the assistance of DEA agents in translating English conversations that were intercepted. Logically, such activity would be unnecessary if the TNP did not plan to use the information in furtherance of its own independent investigation. In addition, there is no evidence that the DEA was, in any way, involved in the decision to seek a wiretap. At most the evidence shows that the DEA requested background information on the Turkish telephone numbers, with the hope that the TNP would wiretap the numbers. Furthermore, the fact that the TNP did not initiate the wiretap until the DEA gave them the numbers demonstrates only that the TNP was unaware that these individuals were using their phones to traffick narcotics. In light of the evidence presented, we can not hold that the district court's conclusions were clearly erroneous. Indeed, as this Court has noted, "[t]he investigation of crime increasingly requires the cooperation of foreign and United States law enforcement officials, but there is no reason to think that Congress expected that such cooperation would constitute the foreign officials as agents of the United States." *Paternina–Vergara,* 749 F.2d at 998 (discussing the Jencks Act). *See also, United States v. Molina–Chacon,* 627 F.Supp. 1253, 1260 (E.D.N.Y.1986) (holding that a foreign search prompted by information from U.S. officials does not trigger Fourth Amendment requirements), *aff'd sub nom., United States v. DiTommaso,* 817 F.2d 201 (2d Cir.1987).

In attempting to circumvent the district court's finding that the TNP was not an agent of the DEA, Pontillo asserts that the DEA participated in the surveillance to such a degree that it made the endeavor a "joint venture", subject to constitutional protections. This Court has not adopted the "joint venture" theory advanced by the Ninth Circuit in *United States v. Peterson,*

812 F.2d 486 (9th Cir.1987), and relied upon by Pontillo. Even were we to adopt this doctrine, the record readily reveals that the level of cooperation between the DEA and the TNP falls far short of the level needed to find the existence of a joint venture. *See, e.g., Pfeifer v. United States Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir.) (holding that there was no joint venture where DEA agent was present and armed while defendant was interrogated in a foreign country), *cert. denied*, 447 U.S. 908, 100 S.Ct. 2993, 64 L.Ed.2d 858 (1980). In any event, it is clear that the TNP's wiretapping of phones in Turkey was prompted not by a desire to circumvent constitutional constraints, but by the logistical problem caused by Pontillo's random selection of pay phones.

In light of the abundant evidence in support of the district court's findings, its conclusion that the TNP was neither an agent of nor in a joint venture with the DEA was not clearly erroneous. Consequently, because the TNP acted of its own accord, we need not reach Pontillo's claims that the wiretap surveillance did not comport with Fourth Amendments standards and decline to do so.

II. *Sentencing Calculation And Procedures*

■ Pontillo also asserts that the district court erred in calculating his offense level by finding that he had conspired to import a total of 25–28 kilograms of heroin. Specifically, Pontillo argues that he should only have been sentenced on the amount he actually imported, and that the amount discussed in the taped conversations should have been excluded because he was incapable of importing this latter amount.

The guidelines provide that a defendant's base offense level, in cases of importing or conspiring to import narcotics, is calculated on the basis of the amount of narcotics involved. However, Application Note 1 to U.S.S.G. § 2D1.4 provides:

[w]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

At the sentencing hearing, Pontillo contended that he was not reasonably capable of producing 24 of the 25–28 kilograms of heroin that the PSR attributed to him. According to Pontillo, his inability to sell the heroin of poor quality that he had previously imported had precluded him from importing the additional quantities under negotiation. The district court rejected this contention. Unfortunately, however, the district court failed to make explicit affirmative findings of fact at the sentencing hearing. Rather, the district court merely rejected Pontillo's proposed factual contentions.

It appears that the district court implicitly accepted the factual findings made in the PSR. If so, the district court need only make this explicit. As the PSR indicated, the taped conversations revealed detailed plans by Pontillo to import at least 20 kilograms, in addition to quantities of heroin which Pontillo had apparently already imported. A review of the transcripts might well have indicated to the district court that Pontillo was primarily concerned with the logistics of importing such a large quantity of narcotics. The court, therefore, could have concluded that there was little, if any, indication that Pontillo lacked the capacity to actually deliver what he negotiated, or that Pontillo was boasting. However, there is evidence in opposition to such a finding. Specifically, DEA Agent DiStephano testified that Pontillo's last conversations indicated that Pontillo did not seem to want to import any more heroin. The district court was, therefore, required to make specific affirmative factual findings. *See, e.g., United States v. Palta*, 880 F.2d 636, 641 (2d Cir.1989). The court's failure to do so compels us to vacate Pontillo's sentence and to remand the case to the district court for resentencing.

We have carefully examined Pontillo's remaining contentions and have found them to be without merit.

CONCLUSION

Based on the foregoing, the defendant's conviction is affirmed. However, the defendant's sentence is vacated, and the case is remanded to the district court for resentencing.