WYNN, Circuit Judge,
with whom FLOYD and THACKER, Circuit Judges,
join, dissenting in part and concurring in the judgment:[1]
A customer buys a cell phone. She turns it on and puts it in her pocket. With those acts, says the majority, she has “voluntarily conveyed” an unbounded set of personal location data to her service provider, all of which is unprotected by the Fourth Amendment. Here, that included 221 days’ worth of information, amounting to roughly 29,000 location-identifying data points for each Defendant.
The majority further claims that “Supreme Court precedent mandates this conclusion,” that “[ljogic compels” it. Ante, at 425, 430. But those contentions are difficult to square with the array of concurring and dissenting opinions that have already been issued by federal appellate judges on this subject.[2] With respect for the differing *442 view of my colleagues in the majority, this is not an easy issue. Not only that, but a close reading of the Supreme Court’s third-party doctrine demonstrates that cell site location information (CSLI) is not “voluntarily conveyed” by cell phone users. It is therefore not beyond the Fourth Amendment’s reach.
I.
A.
' The third-party doctrine operates to bar Fourth Amendment protection only for information that has been “voluntarily conveyed” by an individual to a third party. The majority does not dispute this limitation, see ante, at 426-27, 429-30, nor could it. That phrase, or some slight variation of it, appears without exception as a necessary analytical component in each of the Supreme Court’s founding third-party doctrine cases. Smith v. Maryland, 442 U.S. 735, 744, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (“When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company....” (emphasis added)); id. at 745, 99 S.Ct. 2577 (“[Pjetitioner voluntarily conveyed to [the phone company] information that it had facilities for recording....” (emphasis added)); United States v. Miller, 425 U.S. 435, 442, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (“All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks.... ” (emphasis added)); Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (“Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer’s misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.” (emphasis added)); Lewis v. United States, 385 U.S. 206, 212, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) (“[This case] presents no question of the invasion of the privacy of a dwelling; the only statements repeated were those that were willingly made to the agent and the only things taken were the packets of marihuana voluntarily transferred to him.” (emphasis added)); see also United States v. White, 401 U.S. 745, 749, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (no Fourth Amendment protection where an individual “voluntarily confides his wrongdoing” to another (quoting Hoffa, 385 U.S. at 302, 87 S.Ct. 408)).
The Supreme Court, then, has intentionally employed the “voluntary conveyance” concept in every relevant case to limit the reach of an otherwise sweeping per se rule that denies Fourth Amendment protection. It seems therefore crucial here to ask: what, precisely, did the Court mean when it chose those words, in the context of those cases?
Here is what those various defendants actually did to “voluntarily convey” information. One used his finger to dial, one by one, the numerical digits of a telephone number. Smith, 442 U.S. at 741, 99 S.Ct. 2577 (highlighting that pen registers disclose “only the telephone numbers that have been dialed” (quoting United States v. N.Y. Tel. Co., 434 U.S. 159, 167, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977))). Another submitted multiple checks and deposit slips— *443 each presumably bearing a date, a dollar amount, a recipient name, and a personal signature. Miller, 425 U.S. at 442, 96 S.Ct. 1619. The others actually spoke. White, 401 U.S. at 746-47, 91 S.Ct. 1122 (conversations with a bugged government informant related to narcotics transactions); Hoffa, 385 U.S. at 296, 87 S.Ct. 408 (statements to an associate “disclosing endeavors to bribe [jury] members”); Lewis, 385 U.S. at 210, 87 S.Ct. 424 (conversations with an undercover law enforcement agent in the course of executing a narcotics sale).
In all of these cases — the only cases that can bind us here — “voluntary conveyance” meant at least two things. First, it meant that the defendant knew he was communicating particular information. We can easily assume Miller knew how much money he was depositing, that Smith knew the numbers he was dialing, and that Hoffa, Lewis, and White knew about the misconduct they verbally described to another.
Second, “voluntary conveyance” meant that the defendant had acted in some way to submit the particular information he knew. Crucially, there was an action — depositing, dialing, speaking — corresponding to each piece of submitted information. And where many data pieces were compiled into records — financial records in Miller, phone records in Smith — there was presumptively a discrete action behind each piece of data. The Court never suggested that the simple act of signing up for a bank account, or a phone line, was enough to willingly turn over thousands of pages of personal data.
These two components of “voluntary conveyance” — -knowledge of particular information and an action submitting that information — were thus present in every “Supreme Court precedent” that can “mandate[] [our] conclusion” here. Ante, at 425. Those features also characterize the vast majority of cases where the third-party doctrine has been applied by other federal courts.
When a credit card holder signs a receipt that includes the address of the vendor, the bill amount, and the time of the transaction, she both indicates her knowledge of that particular information and acts to submit it.[3] Thus, courts have held that the third-party doctrine applies to credit card records. E.g., United States v. Phibbs, 999 F.2d 1053, 1077-78 (6th Cir. 1993); see also United States v. Maturo, 982 F.2d 57, 59 (2d Cir. 1992) (credit card records admitted as evidence); United States v. Kragness, 830 F.2d 842, 865 (8th Cir. 1987) (same).
WTien someone types “his name, email address, telephone number, and physical address” into a form and then submits that information to a service provider in order *444 to secure internet access, he not only has knowledge of the typed information but has affirmatively acted to communicate it. United States v. Bynum, 604 F.3d 161, 164 (4th Cir. 2010). Thus, courts'have held that the third-party doctrine applies to subscriber information. Id.; see also United States v. Perrine, 518 F.3d 1196, 1204 (10th Cir. 2008) (collecting cases).
When an internet user types a URL— which is uniquely linked to a single IP address[4] — into her web browser and hits the “Enter” key, she knows the web address and she actively submits it. Thus, although the law in this area is still unsettled, courts have generally concluded that the third-party doctrine applies to the IP addresses of visited websites. See, e.g., United States v. Forrester, 512 F.3d 500, 510 (9th Cir. 2008) (“Like telephone numbers ... e-mail to/from addresses and IP addresses are not merely passively conveyed through third party equipment, but rather are voluntarily turned over in order to direct the third party’s servers.”).[5]
It follows that knowledge of particular information and a corresponding act transmitting that information have defined “voluntary conveyance” in virtually every case espousing or applying the third-party doctrine, and certainly in every case that can bind us here. Those features describe traditional bank records and phone records, hotel bills and airline miles statements, email addresses and social media profile information. This is a description — not a redefinition — of the third-party doctrine.[6]
B.
The foregoing discussion makes clear that CSLI is not “voluntarily conveyed” by a cell phone user, and therefore is not subject to the third-party doctrine.
First, consider how little a cell phone user likely knows about his CSLI. Unlike *445 the deposit amounts in Miller and the phone numbers in Smith, which were at various points made obvious to the user “in the ordinary course of business,” Smith, 442 U.S. at 744, 99 S.Ct. 2577, there is no reason to think that a cell phone user is aware of his CSLI, or that he is conveying it. He does not write it down on a piece of paper, like the dollar amount on a deposit slip, or enter it into a device, as he does a phone number before placing a call. Nor does CSLI subsequently appear on a cell phone customer’s statement, as the relevant information did for the banking customer in Miller and the phone caller in Smith. See Smith, 442 U.S. at 742, 99 S.Ct. 2577 (“All subscribers realize ... that the phone company has facilities for making permanent records of the numbers they dial, [because] they see a list of their ... calls on their monthly bills.”). Consequently, “it is unlikely that cell phone’customers are aware that their cell phone providers collect and store [CSLI].” In re Application of U.S. for an Order Directing a Provider of Elec. Commc’n Serv. to Disclose Records to Gov’t, 620 F.3d 304, 317 (3d Cir. 2010) (In re Application (Third Circuit)). And even if cell phone customers have a vague awareness that their location affects the number of “bars” on their phone, see ante, at 430, they surely do not know which cell phone tower their call will be routed through, a fact even the government concedes. Appellee’s Br. at 53 (“[T]he location of the cell phone tower handling a customer’s call is generated internally by the phone company and is not typically known by the customer.”). User knowledge, the first component of “voluntary conveyance,” is therefore essentially absent.[7]
Second, consider what the cell phone user does — or does not do — to transmit CSLI. As a general matter, “CSLI is purely a function and product of cellular telephone technology, created by the provider’s system network at the time that a cellular telephone call connects to a cell site.” Commonwealth v. Augustine, 4 N.E.3d 846, 862, 467 Mass. 230 (2014). In some instances, CSLI is produced when a user places an outgoing call, an action that arguably corresponds with the generated information (even if the user remains unaware of that information). However, CSLI is also generated when a phone simply receives a call, even if the user does not answer. In these instances, CSLI is automatically generated by the service provider’s network, without any user participation at all. See In re Application (Third Circuit), 620 F.3d at 317-18 (“[W]hen a cell phone user receives a call, he hasn’t voluntarily exposed anything at all.”).[8]
*446 In sum, because a cell phone customer neither possesses knowledge of his CSLI nor acts to disclose it, I agree with the Third Circuit that he “has not ‘voluntarily’ shared his location information with a cellular provider in any meaningful way.” Id. at 317; accord Augustine, 4 N.E.3d at 862; Tracey v. State, 152 So.3d 504, 525 (Fla. 2014).[9]
II.
Because CSLI is not voluntarily conveyed to service providers, the third-party doctrine alone cannot resolve whether the government here conducted a Fourth Amendment “search.” In other words, there must be an independent evaluation of whether “the government violates a subjective expectation of privacy that society recognizes as reasonable” by acquiring large amounts of CSLI. Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). To answer that question, an examination is warranted of both the quality and quantity of the information the government here acquired.
The government obtained 221 days of CSLI for each.Defendant.[10] That amount *447 ed to 29,659 location data points for Graham (an average of 134 data location points per day) and 28,410 location data points for Jordan (an average of 129 location points per day). Each piece of data revealed not only the particular cell tower through which the relevant call was routed, but also a particular 120-degree sector — or one-third “slice” — within that cell tower’s range. The record indicates that the cell sites at issue in this case covered a circular area with a radius no larger than two miles. But given the density of cell sites in urban areas like Baltimore, where Sprint/Nextel operates 79 cell sites within the city limits and many more in Baltimore County, the relevant cell site area was likely far more precise for much of the location data obtained. The records reveal extensive details about Defendants’ locations and movements throughout the seven months-long period. For Graham, over two thousand calls were initiated and terminated in different cell site sectors, indicating movement during the call. Some days offer particularly telling data. For example, during one 38-hour period in October 2010, Graham made and received 209 calls located in 55 different cell site sectors.
In United States v. Jones, — U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), the Supreme Court unanimously held that the government’s installation of a GPS device on a suspect’s vehicle and its use of that device to track the vehicle’s movements over a 28-day period violated the Fourth Amendment. See id. at 949, 954; id. at 964 (Alito, J., concurring in the judgment). A majority of the Court agreed that “longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.” Id. at 955 (Sotomayor, J., concurring); id. at 964 (Alito, J., concurring in the judgment).[11] That conclusion was rooted in concerns about the government’s ability to capture data describing an individual’s movements and aggregate that data “to ascertain, more or less at will,” private information about an individual, such as her “political and religious beliefs, sexual habits, and so on.” Id. at 956 (Soto-mayor, J., concurring). While the Justices left it an open question how long location surveillance could occur before triggering Fourth Amendment protection, Justice Ali-to clarified that “the line was surely crossed before the 4-week mark.” Id. at 964.
Here, we confront a locational data set that is on the whole more invasive than the one considered in Jones. Admittedly, the CSLI acquired here, which could trace an individual to a neighborhood even if not to a specific address, was less precise than the GPS tracking information in Jones. “But precision is not the only variable with legal significance.” United States v. Carpenter, 819 F.3d 880, 894-95 (6th Cir.2016) (Stranch, J., concurring). Quantity matters, too. And in my view, the sheer volume of data the government acquired here decides this case.[12]
*448 Whereas the Supreme Court deemed the government’s collection of - 28 days of location data unconstitutional, the data challenged here spans 221 days — nearly eight times the surveillance period evaluated in Jones. The Eleventh Circuit concluded that a 67-day set of CSLI could “[without question ... when closely analyzed, reveal certain patterns with regard to [the defendant’s] physical location in the general vicinity of his home, work, and indeed the robbery locations.” United States v. Davis, 785 F.3d 498, 516 (11th Cir. 2015) (en banc). I have little trouble concluding that the close analysis of a 221-day CSLI set would reveal much more, potentially “enabling] the Government to ascertain, more or less at will, [an individual’s] political and religious beliefs, sexual habits, and so on.” Jones, 132 S.Ct. at 956 (Sotomayor, J., concurring).
By acquiring vast quantities of Defendants’ location information, spanning months, without Defendants” consent, the government infringed their reasonable expectations of privacy and thereby engaged in a. search. Because that search was war-rantless, it violated the Fourth Amendment.[13]
III.
Even more disquieting to me than the result the majority has reached today is the path it has chosen to reach it.
The majority does not decide, for instance, as did the Third Circuit, that the CSLI employed here was too imprecise or too discontinuous to infringe Defendants’ privacy. See In re Application (Third Circuit), 620 F.3d at 312-13. That narrower holding would have allowed this Court to grapple, in the future, with the effect of rapidly changing phone technology, like the increasing “proliferation of smaller and smaller [cell sites] such as microcells, pico-eells, and femtocells — which cover a very specific area, such as one floor of a building, the waiting room of an office, or a single home,” In re Application for Tel. Info. Needed for a Criminal Investigation, 119 F.Supp.3d 1011, 1023 (N.D. Cal. 2015), or the advent of smartphone “pinging,” whereby location data can be generated almost continuously, see, e.g., In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel., 849 F.Supp.2d 526, 534 (D. Md. 2011). Rather, the majority concedes what follows unavoidably from its holding: “the applicability of the Fourth Amendment [does not] hinge[ ] on the precision of CSLI,” ante, at 426 n. 3, or on its quantity, ante, at 435-36. The Supreme Court has cautioned that “[w]hile the technology used in the present case [may be] relatively crude, the rule we adopt must take account of more sophisticated systems that are al *449 ready in use or in development.” Kyllo, 533 U.S. at 36, 121 S.Ct. 2038. Suppose the same case arises in two years, now featuring months of GPS-pinpointed location data, down to the second. Apply the majority’s rule. Same result.
Neither does the majority hold, as the Eleventh Circuit did in the alternative, that the court order required by 18 U.S.C. § 2703(d), though less than a warrant backed by probable cause, nevertheless satisfied the Fourth Amendment’s reasonableness “touchstone.” See Davis, 785 F.3d at 516-18; id. at 521-24 (Jordan, J., concurring). That holding would have at least preserved a modicum of Fourth Amendment protection for the location data at issue here, requiring an evaluation of the relevant statutory provision that “assess[es], on the one hand, the degree to which [the search] intrudes upon an individual’s privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.” Id. at 517 (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). If that were the Court’s holding, then the majority’s token assurances that “Congress ... has not been asleep at the switch,” ante, at 437, and my concurring colleague’s laudatory musings about Congress’s “striking a balance in an area rife with the potential for mass casualty,” ante, at 440, might do more than salve our judicial consciences: they would actually be doctrinally relevant.[14] But as it is, Congress could repeal the SCA and the ECPA tomorrow. Apply the majority’s rule. Same result.
What this elucidates is the extraordinary breadth of the majority’s decision today. It is not bounded by the relative precision of location data, by the frequency with which it is collected, or by the statutory safeguards Congress has thought it prudent to enact. The majority’s holding, under the guise of humble service to Supreme Court precedent, markedly advances the front-lines of the third-party doctrine. The Fourth Amendment, necessarily, is in retreat.
IV.
Only time will tell whether our society will prove capable of preserving age-old privacy protections in this increasingly networked era. But one thing is sure: this *450 Court’s decision today will do nothing to advance that effort. I dissent.

. In accordance with the practice of my colleague, see United States v. Graham, 796 F.3d 332, 378 n.1 (4th Cir. 2015) (Motz, J., dissenting in part and concurring in the judgment), I have styled this opinion as a partial dissent. Even though I would affirm the Defendants’ convictions under the exclusionary rule's good-faith exception, I take issue with the majority's determination that there was no Fourth Amendment violation, a conclusion which "will have profound consequences in future cases in the Fourth Circuit.” Id.

. Four other federal appellate courts have issued five decisions considering as a matter of first impression the applicability of the Fourth Amendment to CSLI, and those decisions generated seven concurring or dissenting opinions. See United States v. Carpenter, 819 F.3d 880, 884 (6th Cir.2016) (majority opinion); id. at 893-94 (Stranch, J., concurring); United States v. Davis, 785 F.3d 498, 500 (11th Cir. 2015) (en banc) (majority opinion); id. at 519 (W. Pryor, J., concurring); id at 521 (Jordan, J., concurring); id at 524 (Rosenbaum, J., concurring); id. at 533 (Martin, J., dissenting); United States v. Davis, 754 F.3d 1205 (11th Cir.) (unanimous), vacated, reh'g en banc granted, 573 Fed.Appx. 925 (11th Cir. 2014); In re Application of the U.S. for Historical Cell Site Data, 724 F.3d 600, *442 602 (5th Cir. 2013) (In re Application (Fifth Circuit)) (majority opinion); id. at 615 (Dennis, J., dissenting); In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't, 620 F.3d 304, 305 (3d Cir. 2010) (In re Application (Third Circuit)) (majority opinion); id. at 319 (Tashima, J., concurring). The only unanimous panel held that the government’s warrantless acquisition of CSLI constituted a Fourth Amendment violation. Davis, 754 F.3d at 1215. No doubt, when the votes are tallied, more now support the majority's position. But that should not decide this case.

. The majority argues that reading "voluntary conveyance” to require user knowledge would require courts "frequently ... to parse business records [such as credit card records] for indicia of what an individual knew he conveyed to a third party.” Ante, at 430 n. 9. That argument is a bogeyman. Courts would not need to "parse” credit card records to determine whether the cardholder at a grocery knew he was conveying "the date and time of his purchase or the store's street address,” iL any more than the Supreme Court had to “parse” Miller's bank records to determine whether he knew he was conveying the date, amount, or recipient name that appeared on the checks he himself had endorsed. That much was obvious from the nature of the record and the transactions it reflected. Where user knowledge cannot be easily ascertained in this manner, however, I would not force an ill-fitting presumption of voluntariness in order to strip Fourth Amendment protection from a defendant. See Ohio v. Robinette, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ("[Vjoluntariness is a question of fact to be determined from all the circumstances.” (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973))).

. See United States v. Forrester, 512 F.3d 500, 510 n.5 (9th Cir. 2008) (“Every computer or server connected to the Internet has a unique IP address. A website typically has only one IP address even though it may contain hundreds or thousands of pages. For example, Google's IP address is 209.85.129.104 and the New York Times’ website's IP address is 199.239.137.200.”).

. One category of generally admitted third-party information would not be “voluntarily conveyed” under my reading of that requirement: phone records of incoming calls. See ante, at 431-32. Perhaps one reason such information is routinely admitted is that it is rarely challenged by defendants, since it is outgoing call information that tends to be incriminating, as was the case in the sole authority from this circuit cited by the majority. See United States v. Clenney, 631 F.3d 658, 662 (4th Cir. 2011) (investigator “confirmed through phone records that [defendant’s] phone number was the source of outgoing calls”). Regardless, it is an open question whether anyone could credibly assert the infringement of a legitimate expectation of privacy in the numbers dialed by someone else (as one can in her movements over lime, see infra section II). In other words, my view of "voluntary conveyance” may not require excluding warrantlessly procured incoming call information. Even if it did, that would be a small price to pay for preserving the substance of a constitutionally mandated limitation on the third-party doctrine’s scope.

.Indeed, it is the majority who has "improperly attempted] to redefine the third-party doctrine.” Ante, at 425; see also ante, at 429, 431. The majority recasts the Supreme Court’s "voluntary conveyance” language in a double negative, such that "the third-party doctrine does not apply when an individual in voluntarily conveys information.” Ante, at 431 (first emphasis added). The upshot of this approach is that the protections of the Fourth Amendment are limited to situations where "the government conducts surreptitious surveillance or when a third party steals private information.” Id. While the majority might prefer to preserve Fourth Amendment protection only for information that is not coercively seized, that is not the Supreme Court’s standard, and it should not be ours.

. The majority "fail[s] to see how a phone user could have a reasonable expectation of privacy in something he does not know.” Ante, at 430 n. 9. I wonder: does the majority imagine that Danny Kyllo knew what levels of infrared radiation emanated from his home and were recorded with precision by the government’s thermal imaging device? See Kyllo v. United States, 533 U.S. 27, 29-30, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). The rule that one must "know” what one can reasonably expect to keep private is new to me, and I believe to Fourth Amendment doctrine as well. It is also yet another aspect of this Court’s present decision with troubling future implications. I suppose we can also expect no privacy in data transmitted by networked devices such as the "Fitbit” bracelet, which “can track the steps you take in a day, calories burned, and minutes asleep”; the "Scana-du Scout,” which can "measure your temperature, heart rate, and hemoglobin levels”; or the "Mimo Baby Monitor 'onesie' shirt,” which can "monitor your baby's sleep habits, temperature, and breathing patterns.” Scott R. Peppet, Regulating the Internet of Things: First Steps Toward Managing Discrimination, Privacy, Security, and Consent, 93 Tex. L. Rev. 85, 88 (2014); see also infra note 8. Making knowledge requisite to privacy is inconsistent not only with Supreme Court precedent but with our basic societal norms.

.The majority does not take seriously this idea — that information might be automatically generated without user involvement. See ante, at 429 ("[T]here can be little question that cell phone users 'convey' CSLI to their service providers. After all, if they do not, then who does?”); icL ("Perhaps Defendants believe that ... the [service] provider just conveys CSLI to itself.”). But even in the era of Miller and Smith, human beings were not the only entities capable of collecting and conveying information. That is also surely the case now, and will only become increasingly relevant going forward. See, e.g., Neil M. Richards, The Dangers of Surveillance, 126 Harv. L. Rev. 1934, 1940 (2013) ("The incentives for the collection and distribution of private data are on the rise. The past fifteen years have seen the rise of an Internet in which personal computers and smartphones have been the dominant personal technologies. But the next fifteen will likely herald the 'Internet of Things,' in which networked controls, sensors, and data collectors will be increasingly built into our appliances, cars, electric power grid, and homes, enabling new conveniences but subjecting more and more . previously unobservable activity to electronic measurement, observation, and control.”); Peppet, supra note 7, at 88-89. Today, the majority saddles us with a rule that does not distinguish between information an individual himself conveys and information that computerized devices automatically record, generate, and transmit. In other words, the majority's' expansive interpretation of Miller and Smith will, with time, gather momentum— with effects increasingly destructive of privacy-

. Because CSLI is not voluntarily conveyed by cell phone users, I find it unnecessary to wade into the murky waters that separate "content” from "non-content” information. The point of the "content” designation, as recognized by the Supreme Court, is that even some information that is voluntarily conveyed to (or routed through) third parties is nevertheless protected by the Fourth Amendment. For example, even though one voluntarily conveys information by speaking into a public telephone receiver,. "the contents of [those] communications” are protected. Smith, 442 U.S. at 741, 99 S.Ct. 2577. The voluntarily conveyed content contained in a letter, Ex parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877 (1877), or in the body of an e-mail, United States v. Warshak, 631 F.3d 266, 288 (6th Cir. 2010), is protected, too. But where the information in question was never voluntarily conveyed in the first place, the third-party doctrine should have no application, even if that information is deemed “non-content.”

. This CSLI acquisition far eclipses any a federal appellate court has previously approved. Cf. Carpenter, 819 F.3d at 885-86 (considering two CSLI acquisitions, for separate defendants, spanning 88 and 127 days); Davis, 785 F.3d at 515 (CSLI acquisition spanning 67 days); In re Application (Fifth Circuit), 724 F.3d at 608 n.9 (CSLI acquisition spanning 60 days).

. That is, five Justices agreed that longer-term location monitoring could violate an individual's reasonable expectation of privacy. Although the majority opinion was grounded in a trespass-based rationale, see id. at 949, it made clear that “[sjituations involving merely the transmission of electronic signals without trespass would remain subject to [reasonable expectation of privacy] analysis,” id. at 953.

. The majority wonders "why ... only large quantities of CSLI [would] be protected by the Fourth Amendment.” Ante, at 435. That is a fair question to ask of Defendants, who maintain that even smaller amounts of CSLI can be used to peer "into the home.” Appellants’ Br. at 20. In my view, however, the CSLI utilized here was not precise enough to implicate an individual’s privacy interest in the home's interior. See United States v. Karo, 468 U.S. 705, 714-16, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). Consequently, I consider the main privacy expectation infringed here to be in Defendants' movements over an ex *448 tended period of time, which necessarily requires examining the quantity of data obtained. Furthermore, I agree that "[intrinsic to the [third-party] doctrine is an assumption that the quantity of information an individual shares ... does not affect whether that individual has a reasonable expectation of privacy.” Ante, at 436. That is, in part, why the majority's holding is so troublingly broad. See infra section III. But having determined that CSLI is not voluntarily conveyed, and thus that the third-party doctrine does not decide this case, I must evaluate separately whether a reasonable expectation of privacy has been infringed. Because the basis for my decision is extrinsic to the third-party doctrine, it is natural that I would not be bound by an "intrinsic ... assumption” of that doctrine.

. “[A]s a general matter, warrantless searches 'are per se unreasonable under the Fourth - Amendment....' ” City of Ontario, Cal. v. Quon, 560 U.S. 746, 760, 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010) (quoting Katz, 389 U.S. at 357, 88 S.Ct. 507). In my view, none of the "few specifically established and well-delineated exceptions” to that rule apply here. Id.

. My concurring colleague joins the majority based on his "fear that by effectively rewriting portions of a federal statute under the guise of reasonableness review courts run the risk of boxing the democratic branches out of the constitutional dialogue.” Ante, at 438. If that is truly the grounds for his concurrence, I hope my friend understands that the majority's opinion today will be the last word spoken in that "dialogue.” It is a conversation ender. Following today's decision, the judiciary will have absolutely no role in articulating what protections the Fourth Amendment requires for private information that is not either directly gathered by the government or secretively stolen by third parties. We have thus avoided "boxing out” the other branches, but only at the cost of boxing out ourselves. So much for a "collaborative enterprise among the three departments of government.” Ante, at 438. By the way, the statutory "rewriting” my colleague fears would require eliminating a single line of statutory text, specifically 18 U.S.C. § 2703(c)(1)(B). The efficiency of that modification is possible because Congress, as my colleague recognizes, provided in its "carefully tailored scheme,” ante, at 439, that the government could acquire non-content customer information by obtaining a warrant. 18 U.S.C. § 2703(c)(1)(A). One wonders whether Congress itself might have anticipated the potential for a contrary decision today. Finally, although I appreciate my colleague's civics lesson on the institutional competencies of Congress, I would remind him of one of our own: judicial review. See Marbury v. Madison, 5 U.S. 137, 178, 1 Cranch 137, 2 L.Ed. 60 (1803).